(No. 11072.—Reversed and remanded.)
MARSHALL HARTLEY, Exr., *et al.* Appellants, *vs.* BERT
HARTLEY *et al.* Appellees.

*Opinion filed June 21, 1917—Rehearing denied October 3, 1917.*

1. TRUSTS—*when a conveyance is presumed to be an advancement and not in trust.* Where one party purchases real estate with his own money and has the title conveyed to a stranger the law will imply a resulting trust in favor of the one furnishing the purchase money, but where a husband or father furnishes the purchase money and has the deed made to a wife or child the presumption is that the deed is a gift or advancement.

2. SAME—*party seeking to establish a resulting trust through payment of the purchase money must fully prove his claim.* If the person holding title denies the party claiming a resulting trust paid the purchase money, it is incumbent upon the party seeking to establish the trust to prove the payment out of his own means by proof which is clear, full and satisfactory.

3. SAME—*presumption that conveyance was a gift or advancement is not conclusive.* The presumption that where a husband or father places the title to land purchased by him in the name of his wife or child the conveyance was intended as an advancement is not conclusive but may be overcome by proof showing a contrary intention, as it is the intention that must control, and what that intention was may be proved by the same quantum of evidence required to establish any other fact.

4. SAME—*fact that father has retained possession after placing title in name of son is of little importance.* The fact that a father, who has purchased land and placed the title thereto in the name of his son, has retained possession is of little importance in determining whether the conveyance was intended to be an advancement or in trust, as the father could by oral agreement retain the control and use of the land during his lifetime and the conveyance would be a valid grant of the future interest.

APPEAL from the Circuit Court of Douglas county; the Hon. WILLIAM K. WHITFIELD, Judge, presiding.

GREEN & PALMER, (HENRY I. GREEN, ORIS BARTH, and J. N. POMEROY, of counsel,) for appellants.

279 — 38

EDWARD C. CRAIG, DONALD B. CRAIG, and JAMES W.
CRAIG, JR., for appellees.

Mr. JUSTICE FARMER delivered the opinion of the court:

This was a bill filed in the circuit court of Douglas
county by Mathias Hartley against his son Bert Hartley
and the latter's wife to have the son declared a trustee,
rather than the owner in fee simple, of two farms in said
county. Before the suit was begun Mathias Hartley had
requested his son to execute a written lease to him of one
of the farms and to make a deed to another son of the other
farm, which Bert refused to do and claimed the farms as
gifts from his father. The case was referred to a master
in chancery, and after a part of the evidence was taken Ma-
thias Hartley died. His will was probated and the proper
parties were substituted as complainants in this cause and
the evidence completed. The master in chancery reported,
recommending that the son Bert be held to have the legal
title to the two farms as trustee for those to whom his
father willed the land, but the court sustained the exceptions
filed to the master's report and dismissed the bill for want
of equity. This appeal followed.

Mathias Hartley, at the time the bill was filed, was about
seventy-six years of age. He had been a farmer for many
years and had purchased and owned at various times con-
siderable land, both in this State and west of the Mississippi
river. Some of this land before his death he had conveyed
to several of his children and quite a large portion he still
owned and disposed of by his will. Ten children were born
to him: Alice, Linzy, Theodosia, David, Marshall, Bert,
Bertha, Edward, Evander and Frances. Edward died in
infancy and Alice and Bertha both died before the decree
was entered herein, each having married and leaving chil-
dren. Years before the elder Hartley's death the relations
between him and his wife became so strained that they
ceased living together. The disagreement finally resulted,

in 1896, in her filing suit for divorce. Thereafter an arrangement was entered into between them whereby the court decreed her a separate maintenance, requiring him to pay her $1000 a year, with various other provisions relating to the custody of the youngest child and the property interests. Mrs. Hartley is still living and is one of the appellants in this cause. The evidence tends to show that Mathias Hartley for years before his death, on account of this trouble with his wife and the difficulty arising from getting her to sign deeds to convey real estate, was in the habit of having the land which he purchased placed in the name of some person other than himself, so that if he desired to sell it he would not be obliged to ask his wife for her signature, with the possibility of her refusing to sign unless he paid her part of the proceeds, as he was compelled to do some few times after the separate maintenance suit. The evidence shows that he had two farms conveyed in this manner to S. A. Miller, a business man in Minonk, Woodford county, and that Miller afterward conveyed the farms to Hartley himself or to the purchaser, as requested. He had one or more farms deeded in that way to his daughter Alice, who afterwards conveyed as requested by the father.

The testimony of Mathias Hartley was taken before the master in chancery prior to his death. He testified that in 1899, through Taylor & Son, real estate agents, he purchased the 73 acres in controversy, known as the North Newman farm. After some negotiations he notified Taylor & Son he would buy the land provided his son Bert would take the title in his name and convey it to the father or to anyone else at his father's request. He saw Bert about the matter, and Bert said he would accept the conveyance of the 73-acre farm on those terms or of any other land the father might have deeded to him. Hartley further testified he told his son Bert why he desired to have the deed made to him; that it was because he might not want to keep the land permanently, and if he took the title in

his own name and decided to sell it he might have trouble in getting his wife to sign the deed. In 1901, through the same real estate agents, Taylor & Son, he purchased another farm of 140 acres, referred to as the West Newman farm. Mrs. Williams was the owner of this farm, and through her son, as her agent, she executed a contract with Hartley to sell him the land, which both of them signed. Hartley testified that after the contract was signed and before the deed was made he again saw his son Bert, who was living on one of the father's farms in Edgar county, and told Bert he was going to buy the land and have the deed made to him for the same reasons and under the same conditions as the 73-acre farm, and that Bert told him he would convey it on request to anyone he suggested. Pursuant to the contract the elder Hartley paid the purchase price and had the deed made to his son Bert. It is not disputed that Mathias Hartley paid out of his own means the full consideration for both farms and that he borrowed a part of the money to make the payments. The witness also testified that he had previously had two tracts of land he bought conveyed to S. A. Miller for the same reasons he had the deeds made to his son Bert, and that Miller afterwards executed deeds as and when requested by the witness. He further testified that in 1891 he purchased a farm of 92½ acres and had the deed made to his daughter Alice, who afterwards, at the father's request, conveyed the land to him. Deeds to Alice for said tract of land and from her to her father were introduced in evidence.

A. Taylor, of the firm of Taylor & Son, died before this litigation began. His son, A. A. Taylor, testified on behalf of appellants. He testified he knew of the relations between Mathias Hartley and his wife, and remembered the negotiations for the sale to Hartley of the 73 acres, or the North Newman farm; that after Hartley had looked over the land he said he believed he would buy it but wanted to see Bert before he did so about having the deed made to

him for convenience in making a deed should he later wish to convey it. After this conversation Hartley went away and came back the next day and bought the land. The witness testified he remembered the sale he and his father made in 1901 of the 140-acre farm owned by Mrs. Williams; that Hartley examined the land, agreed to take it at the price agreed upon and the deed was made to Bert. He did not remember that Hartley made any statement at that time of his reasons for having the deed made to Bert.

S. A. Miller testified for appellants that he was seventy-nine years old and had known Mathias Hartley for more than forty years. The witness was engaged in the mercantile business. He testified that about 1888 Mathias Hartley consulted him about permitting Hartley to have a deed to a tract of land he contemplated purchasing made to the witness. Hartley explained that on account of the relations between him and his wife, with which the witness was familiar, he desired to put the title in the witness' name so that if he wanted to sell the land he could do so without any trouble. This was done, and the witness afterwards made a deed conveying the land according to the request of Hartley. Witness thought he also received a conveyance to a tract of land at another time and conveyed the same at Hartley's request. The witness also testified that Hartley told him he was going to buy the 73-acre farm and have the deed made to Bert; that he thought Bert was all right. The witness testified his recollection was that Hartley talked with him also about having the deed to the 140-acre farm made to Bert. No writing was given to Hartley by the witness when the deed or deeds were made to him for the land bought by Hartley.

The son Bert Hartley, whose testimony was taken after his father's death, stated that during the trouble between his father and mother he sided with his father, and on that account his father was friendly to him; that the father gave the son Linzy a half section of land in Missouri in

1896, and the next year gave the son Marshall a half section in Iowa. He denied having had any conversation or agreement with his father that he would hold the lands in trust before the two Douglas county farms were deeded to him. He said that after each of the deeds was executed, as to each of these farms his father told him that he had deeded and given the farm to him; that all his father wanted was the use of the lands during his lifetime and after his death the farms should belong to Bert; that he thanked his father and said that was all right. Bert further testified that the father had stated to him that he not only had given him these two farms in Douglas county but intended to give him the farm near Cherry Point, in Edgar county. He also stated that his father, while living with him about ten years before, had a serious operation, and shortly before being placed under the anæsthetic gave Bert a large, sealed envelope, with instructions that in case of the father's death Bert should deliver it to the banker at Minonk, but that his father made no request at that time that he sign any papers with reference to these two farms, although they then stood in Bert's name. The father, in his testimony, conceded that he made no request at that time as to the son deeding over the two farms; that he was too sick then to consider that question.

On behalf of appellees, P. H. Williams, who acted as agent for his mother, the owner of the 140 acres, in making the sale through Taylor & Son to Mathias Hartley, testified that Hartley requested that the deed be made to Bert, and said he was giving the land to his son Bert. The witness stated that after the lapse of so long a time he could not remember the language used very clearly, but that he got the impression from what Hartley said about deeding the land to Bert that he was buying it for Bert.

Two or three witnesses testified that in a hearing over the opening of a road in 1902 that affected the North Newman farm the father testified, under oath, that the property

belonged to Bert. In another hearing before the highway commissioners with reference to straightening the road near the same farm, in 1909, witnesses testified that the father stated that this farm belonged to the son, and that if they wanted to do anything about settling the matter they must go and see the son, one of the witnesses stating that he said to the father that he supposed the land belonged to him, but the father said, "No, it belongs to Bert Hartley, my son, and I am over here to assist him in regard to getting damages on this road." The justice of the peace who heard one of these cases, testified, on the other hand, that the father stated that the legal title, only, was in the son; that he (the father) really owned the farm, and that the witness' recollection was he stated the reason why the title was in the son. The testimony shows, without contradiction, that while the son was paid by the public authorities the money for the damages in each of these road hearings he turned it over to his father. The testimony also shows that in talking about a drainage ditch proceeding including the West Newman farm the father said to certain of the public officials that the farm belonged to his son. There is also testimony that Bert said he could not vote at a certain drainage election which affected one or both of these farms; that he did not own the land; that the land belonged to the father. The son Evander testified that he had a conversation with his brother Bert before his father's death in which Bert stated that the father had not given him the two farms in question but had just put them in his name so that they could be disposed of readily; that the farms actually belonged to the father, and that Bert was willing to sign a deed to either of them at any time his father so requested.

The testimony tends to show that the first dispute between father and son relative to ownership of these farms arose some time in 1913 or 1914; that at this time the father requested the son to sign a written lease for the 73-acre farm

and a deed to the 140-acre farm conveying it to another son, David, and that Bert refused to sign the lease or execute the deed, apparently insisting that he owned both farms and that the father was only entitled to the rents and profits during his lifetime. Not long thereafter the father began this suit. In 1907 the father purchased two farms in Missouri,—one of about 400 acres, which he deeded to his son Bert, and one of about 513 acres, which was deeded to his son Evander. It was conceded that both of these farms were intended to be given outright to the two sons. For some time prior to the beginning of this litigation the son Bert had disagreements with some of his brothers, apparently with reference to a division of the property among the brothers and sisters and because some of the brothers thought that Bert was not entitled to all the land that he then had in his name. It appeared, also, at the time testimony was taken in this case that some of these brothers were not on the best of terms with Bert. The father testified that he wanted the son Bert to deed these farms over so he could make a more even division of the property among his children than then existed. The father, at the time of his death, owned 380 acres of land in LaSalle county, 526 acres in Edgar county and 320 acres in Kansas. By his will he gave one of these Douglas county farms to the children of a deceased daughter and the other farm to the son Evander. The evidence shows that if the son Bert is the owner of these two farms he will get a much larger amount from his father's estate than any other child, and the children of one of the deceased daughters will receive no considerable amount from the elder Hartley's estate. The evidence, however, also shows that even if Bert is held to be only a trustee under these deeds, the children of the elder Hartley will not receive equal amounts from the father's estate. Under the father's will Bert was only given $10, and it is provided that Bert's children shall not have any part of the property.

Testimony was offered by both parties to this litigation showing that the father and son had each made certain statements or done certain things with reference to these farms which tended to show that the farms belonged to the other. The evidence shows that the son was not present when the deeds were executed or when the purchase money was paid. It tends to show that the deeds were delivered, in each instance, to the father, who filed them for record, and after they were recorded they were returned to him and were in his possession at the time he was testifying; that the father entered into actual possession of the land as soon as the deeds were executed and delivered and that the son never had any possession of either of the farms under the deeds themselves; that he was never in possession of the 140-acre tract, as a tenant or otherwise; that from 1899 until 1913 he had no possession of the 73-acre tract; that he first took possession of this tract in the last mentioned year under an oral lease from his father, paying rent for the same until his father's death; that the son, in the ten years following 1899, resided as a tenant on his father's farm near Cherry Point, in Edgar county, paying his father rent; that for the two or three years following 1899 he lived with his family in Kansas, Colorado and California, arranging with his father to come back on the 73-acre farm as a tenant in 1912 and 1913; that the son never received any rents from either of these tracts before his father's death and never paid any taxes; that the father paid all the taxes on the land during these years and paid for all the improvements that were made on either farm; that while the son was a tenant on the 73-acre tract the father spent some $400 for improvements on that tract, re-roofing some of the buildings and rebuilding the fences; that the son never exercised any dominion or control over these farms during all those years; that during the time he was living on the Cherry Point farm the son had charge of renting one or both of the farms for several years but

stated he was acting as agent of the father in so doing; that the father was the real owner of the farms; that the son stated to a witness who did carpenter work on the buildings and built a spring house on one of the farms that the work was being done for the father.

It is well settled that where one party purchases real estate with his own money and has the title conveyed to a stranger the law will imply a resulting trust in favor of the one furnishing the purchase money, but where a husband or father furnishes the purchase money and has the deed made to a wife or child the presumption is that it was a gift or advancement. If the person holding the title denies the party claiming a resulting trust paid the purchase money, it is incumbent upon the party seeking to establish the trust to prove the payment out of his own means by proof which is clear, full and satisfactory, or, as stated in some of the cases, beyond a reasonable doubt. If the parties are strangers to each other such proof will warrant a decree declaring a resulting trust, but where they are parent and child or husband and wife, proof that the father or husband paid the purchase money, however conclusive, is not sufficient to raise a trust, for in that case the presumption of law is that it was a gift or advancement. This presumption may be overcome by proof showing that it was not intended to be a gift or advancement but was a conveyance in trust. It is the intention of the parties in such cases that must control, and what that intention was may be proved by the same quantum or degree of evidence required to establish any other fact upon which a judicial tribunal is authorized to act. In Perry on Trusts the author says (vol. 1, 5th ed. sec. 146): "If there is any circumstance accompanying the purchase which explains why it was taken in the wife's or child's name and shows that it was not intended to be an advancement but was intended to be a trust for the husband or father, the presumption of an advancement will be rebutted and the in-

ference of a trust will be established." Section 147 reads: "Whether a purchase in the name of a wife or child is an advancement or not is a question of pure intention, though presumed in the first instance to be a provision and settlement." These sections have been quoted or cited with approval in numerous decisions of this court, a few of which are: *Dodge v. Thomas,* 266 Ill. 76; *Bachseits v. Leichtweis,* 256 id. 357; *Dorman v. Dorman,* 187 id. 154; *Maxwell v. Maxwell,* 109 id. 588; *Smith v. Smith,* 144 id. 299; *Wormley v. Wormley,* 98 id. 544. See, also, Bispham's Principles of Equity, (7th ed.) sec. 84; *Peterson v. Farnum,* 121 Mass. 476.

We have endeavored to set out briefly the substance of the testimony we regard as the most important upon the question of intention. Little importance in determining the intention of Mathias Hartley in causing the deeds to be made to his son Bert can be given to the fact that the father retained the right to the control of the farms during his lifetime and was to receive the rents and profits therefrom. If the father intended the deeds as grants of future interests and entered into a verbal agreement with the grantee by which he retained possession, control and use of the property during his lifetime, they would be valid grants of a future interest. (*Craig v. Rupcke,* 274 Ill. 626.) The important inquiry, therefore, is as to the intention in having the deeds made to Bert. The law presumes they were gifts, and unless that presumption is overcome by testimony that they were not intended as gifts that presumption will prevail. Appellants contend they were not intended as gifts, while appellees rely upon the presumption of law and contend that the evidence is not sufficient to show an intention contrary to the legal presumption. We are of opinion the testimony shows Mathias Hartley did not intend the deeds to the land to operate as gifts to his son Bert. The father was rather extensively engaged in trading in land, and the proof shows he had trouble in securing

his wife's signature to deeds conveying land that was in his name. For that reason he adopted the plan of having the deeds to land he purchased made to other parties so that he could convey it without consulting his wife. For this reason deeds to two tracts of land were made to the witness Miller on the verbal promise of Miller that he would execute deeds on request of Hartley, and he did execute deeds when requested and to the parties named by Hartley. Hartley also had one such deed made to his daughter Alice, who executed a deed to her father at his request. He testified that when he bought the land and had the deed made to his daughter he was not sure he would keep the land, but when he decided to keep it the daughter conveyed it to him upon his request. It is not disputed that he claimed, when negotiating for the 73-acre tract, he wanted to consult with his son Bert about having the deed made to him, stating the reasons why, and that the following day he came back, completed the deal and had the deed made to his son. Miller's testimony, also, is to the effect that Hartley was considering having deeds made to Bert of land he bought, for the same reasons he previously had deeds made to Miller. To our minds this testimony clearly shows it was not the intention of Mathias Hartley, at the time the deeds were made, to make a gift of the lands to his son Bert, and this proof is not overcome by the testimony of Williams and the other witnesses who testified to statements made by each of the parties to the effect that the land belonged to the other.

The court erred in dismissing the bill, and the decree is reversed and the cause remanded, with directions to grant the relief prayed in the bill.

*Reversed and remanded, with directions.*