HELEN GEORGOPOLIS, ALSO KNOWN AS HELEN GEORGE (NOW WOOLERY), AND OTHERS v. PETER GEORGE, ALSO KNOWN AS PETER GEORGOPOLIS, AND OTHERS.[1]

June 20, 1952.

No. 35,725.

[1]Reported in 54 N. W. (2d) 137.

*T. H. Wangensteen,* for appellants.

*Silver, Green & Goff,* for Peter George, respondent.

Loring, Chief Justice.

In this suit plaintiffs appealed from a judgment entered after an order denying their motion for amended findings or for a new trial.

Defendant Peter George will hereinafter be referred to as defendant. His relative, Peter Georgantones, was joined as a defendant only because he holds a mortgage on the property involved in the suit. He will hereinafter be referred to as Georgantones. Plaintiffs, who are the six brothers and sisters of defendant, will each be referred to by his first name.

Defendant holds legal title to a house and lot at 1621 Niles avenue, St. Paul. Plaintiffs sought to have him declared a trustee of that property for their and his benefit, in varying percentages. Their case seems to have been based on three alternative theories: (1) That there was a resulting trust in that the parties bought the house as a joint enterprise; (2) or that a constructive trust should be declared on a theory of unjust enrichment of defendant; (3) or that defendant breached a trust arising from the family relationship in that he failed to disclose certain information which he was under a duty to disclose.

Plaintiffs attack the findings of the trial court, which may be best summarized by quoting finding No. 7:

"That the plaintiffs have not established by clear and satisfactory evidence that they, or any of them, or their father, * * * or their mother, * * * have made any contributions toward the purchase price of the premises * * * or that they, or any of them, * * * have at any time paid any sum for any specific part or interest in said premises."

This attack on the findings raises two questions: (1) Whether the evidence sustains the findings; and (2) whether it is a correct rule that plaintiffs were under the burden of proving by "clear and satisfactory evidence" that they contributed to payments on the house. A subsidiary question is whether defendant's testimony was lacking in credibility as a matter of law. Other questions are: (1) Whether the trial court acted within its discretion in refusing to submit to a jury certain issues as requested by plaintiffs; and (2) whether Helen has any claim against the property as the result of her payments on the mortgage after commencement of the suit.

Evidence was introduced of family and individual transactions over a period of time from prior to 1938 through 1949. It would serve no useful purpose here to detail all the transactions. Prior to the spring of 1938 the whole family lived in a rented house. The mother was not well. The house on Niles avenue was bought that summer, and title was taken in defendant's name. The parents subsequently died, and now plaintiffs seek to have the property declared to be held in trust for the surviving members of the family.

Defendant testified that before the house was bought, he and Alex paid the rent on the house which the family occupied, and that, for several months immediately prior to the move into the Niles avenue house, defendant alone paid the rent. Plaintiffs deny this. Some little time before that move, defendant learned that the house on Niles avenue was for sale and consulted the real estate agents. The original price of the house was $6,000, but the final price was $4,800, with a $400 down payment. Defendant said that his only discussion about buying the house was with Paul and Alex. He testified that Paul said that he did not have his share of any down payment but that he would pay it up in weekly install-

ments. Defendant testified that Alex said that he "would not assume that responsibility, that will be yours." Defendant testified that he paid the whole down payment, borrowing $300 on his car and $50 each from Alex and the father. Helen testified that she paid $100, Alex and the father $50 each, and defendant $200. Documentary evidence, including that of the loan on his car, tends to support defendant's testimony.

All the members of the family able to do so contributed to the living expenses of the family. Defendant testified that he agreed to contribute the house and to pay the milk bill (he was then working for a dairy). The others contributed work around the house and cash in varying amounts to the family fund. Plaintiffs say that payments for the house came from the family fund and that defendant's contribution was of money. It seems to be conceded that, except for the time when he was in the army, defendant generally did the physical act of making the payments on the house and the taxes. The same is true as to an oil burner bought for the house. But plaintiffs claim that money for these came from the family fund. The telephone was in Helen's name, and the electric bill came in the father's. Defendant does not claim ownership of all the furniture.

On making the down payment, defendant assumed a prior mortgage on the property and took over the property under a contract for deed. He made two payments of $50 each under the contract; then, in the fall, Georgantones lent defendant the money to pay up the prior mortgage and the contract. Defendant gave Georgantones a promissory note and mortgage. Most of the plaintiffs testified that they knew nothing of the contract for deed, that they thought mortgage payments to Georgantones were started immediately when they moved into the house. However, it was well established that until the fall of that year the house was occupied under a contract for deed. Plaintiffs also testified that defendant and other members of the family went to see Georgantones before the house was bought to see if he could lend the money to them. This is corroborated by Georgantones. Defendant testified that he did not go

to see Georgantones at that time, but that later in the summer Georgantones asked him to let him take the mortgage. It was brought out that Georgantones lent money on mortgages.

On this appeal, plaintiffs rely strongly on Georgantones' testimony, contending that he was a disinterested witness. A disinterested lawyer, Clarence A. Maley, also an officer of the American National Bank, drew up the mortgage papers for Georgantones. We shall discuss the testimony of both of them together.

Georgantones said that defendant and other members of the family approached him in the spring of 1938 about a loan to buy a house for the family. He testified that they said it would be in defendant's name, although everyone was to pay on it. On cross-examination, his testimony was vague but to the effect that a mortgage was drawn in the spring. Plaintiffs testified that the mortgage was not consummated until the fall because the owners of the property were out of town. Maley, who drew up the mortgage, testified that Georgantones, *early in the fall,* said that he would like to take the mortgage; that he (Maley) tried to dissuade him, as he did not consider it a good risk, but that Georgantones told him that he was "dealing with relatives." In contradiction to plaintiffs, Maley testified as follows:

"Q.　*　*　*　about how long after he asked you to prepare the mortgage did you close the transaction?

"A.　Shortly after that.

"Q.　Would that be a matter of days?

"A.　A few days, yes."

Georgantones testified that Maley told him that the house belonged to the family. He said that he heard defendant tell Maley that he was buying the house for the family. Maley testified to the contrary. He said that at the time of the original mortgage nothing was said to him (Maley) about anyone but defendant being the owner, and that he did not learn that anyone else claimed an interest until about a year before the trial, when the dispute started which led to this suit.

Defendant went into service in December 1943. He made an allotment to his mother, of which part was paid by the government and part taken from his pay. Helen paid the taxes and made payments on the house that year; but defendant testified that the money came from this allotment, that Helen reported the payments to him, and that she did not claim that the payments were made from her own money. It should be noted that before he went into service the mortgage was renegotiated so as to lower the payments. Later, defendant borrowed some $1,600 with which to buy stock and increased the mortgage by this amount. He said that the family did not say anything to him about it when they learned of it. This is contradicted by plaintiffs.

The father died in 1941, the mother in 1947. Plaintiffs testified that just before the mother's death, while she was in the hospital, defendant told her that he knew the house was everybody's home. Defendant at first denied that he had any conversation with the mother at that time; then, on redirect examination, he said that he only told her he would not sell the house, not that it belonged to everyone.

In 1949, defendant made a will in which he left the house to Helen. On the stand she admitted that she knew this and that she did not protest when defendant told her about it.[2] She also admitted that she told defendant in 1949 that if he were going to sell the house she wanted to buy it.

Paul admitted that from the time he was discharged from the service in 1945 he had not contributed to payments on the mortgage or taxes. Mary testified that when she married and moved out of the house she no longer contributed to the family fund because she did not figure that she should. Alex said that he married in 1947, moved away from the house, and he also stopped contributing to the family fund. Euripedes testified that after he was discharged

---

[2]Plaintiffs prepared a narrative record for this appeal to take the place of the 1,063-page typewritten transcript. The narrative is so lacking in objectivity that it has been necessary to examine the transcript, from which these facts are taken. The lack of candor is particularly apparent as to Helen's admission concerning the will.

from the service he lived at home and went to school under the G. I. bill, receiving $60 to $75 a month subsistence pay from the government. Yet he said that he did not contribute to the family fund.

Although we have gone to some length in reciting the facts, we have not nearly covered the great mass of detail introduced in evidence. Plaintiffs, generally, testified as to money they said they gave to defendant for payments and as to work they did around the house. This is contradicted by defendant.

On an attack on the findings of the trial court, the question on appeal is whether the evidence sustains the findings, using all possible inferences supporting the findings. 1 Dunnell, Dig. & Supp. § 411. Where the evidence is conflicting and contradictory, it is a question for the trial court or a jury as the case may be. The number of witnesses does not establish the weight of the evidence; the testimony of one witness may be the basis for a verdict or a finding. Benson v. Northland Transp. Co. 200 Minn. 445, 274 N. W. 532.

Plaintiffs point out that defendant's testimony was inconsistent in a few instances, principally as to the conversation with the mother (noted above). Defendant's testimony was no more inconsistent than that of the other parties. When several of the plaintiffs testified that the mortgage payments to Georgantones commenced at once after the purchase of the house, this was in direct conflict with facts conclusively established by documentary evidence, i. e., the instrument itself. Helen was inconsistent when she attempted to explain where she obtained the money with which she asserted that she contributed to the down payment on the house. We need not detail other inconsistencies. At any rate, defendant's inconsistencies were not so material as to require that all his testimony be disregarded, and he was corroborated to some extent by independent witnesses. The trial judge could observe the witnesses; it was for him to weigh their credibility.

The evidence supports the findings of the trial court.

■ Question is raised whether the trial court properly required of plaintiffs that they establish by clear and satisfactory evidence that they contributed to payments on the home. In Durfee v. Pavitt, 14 Minn. 319 at p. 320 (424 at p. 429), this court said:

"It is a well-settled doctrine under the statute of frauds that where one man buys land and pays for it with his own money and takes a conveyance in the name of another a trust results by operation of law in favor of the person so paying the purchase money. Sugden, Vend. 255.

"It is also determined by the weight of authority that the trust in such case need not appear on the face of the deed, but that such trust can be established or rebutted by parol evidence. *In that case, however, the evidence must be clear and satisfactory.*" (Italics supplied.)

Again, in Randall v. Constans, 33 Minn. 329, 338, 23 N. W. 530, 534, this court said:

"The rule is also well settled that, after considerable lapse of time, the evidence establishing a parol or an implied trust ought to be *very clear and satisfactory.*" (Italics supplied.)

In Hartley v. Hartley, 279 Ill. 593, 602, 117 N. E. 69, 73 (cited by plaintiffs), the court said:

"* * * If the person holding the title denies the party claiming a resulting trust paid the purchase money, it is incumbent upon the party seeking to establish the trust to prove the payment out of his own means by proof which is clear, full and satisfactory, or, as stated in some of the cases, beyond a reasonable doubt."

In the case at bar, it is not questioned that legal title is in defendant. Nor is it questioned that defendant paid a good share of the down payment and other payments on the house. Plaintiffs seek to engraft a trust on the property after more than 10 years from the time defendant acquired title. Memory of details is necessarily less lucid after such a period of time. It would seem that to have a court of equity go behind a legal title valid on its face plain-

tiffs should be put to the burden of showing their equitable rights by clear and satisfactory evidence.

■ The next question is whether the judgment is sustained by the findings.

What are the equitable rights plaintiffs seek to have established? It is their first claim that the purchase of the house was a joint enterprise and that the property should be impressed with a trust under the rule of Irvine v. Campbell, 121 Minn. 192, 141 N. W. 108. This is based on testimony of plaintiffs that three members of the family, other than defendant, contributed to the down payment, and that the payments on the house and taxes were made from the family fund. Plaintiffs also contend that the fact that other members of the family did work around the house showed that the whole family intended this to be a joint enterprise. In most families, whether the house is owned or rented, various members do the household tasks. These duties or burdens arise from the family relationship, not from ownership. The same is true as to the purchase of utilities and groceries. It is not a necessary inference from such testimony that it showed an intention of joint ownership in the house, particularly where such joint ownership is contradicted by the legal title in the name of only one.

In Sieger v. Sieger, 162 Minn. 322, 327, 202 N. W. 742, 744, 42 A. L. R. 1, we said that a party seeking to have a trust declared need not have paid all of the consideration for the property; "it is sufficient if he pays a definite or aliquot part thereof." However, in the case at bar defendant denied that anyone other than he himself contributed to any of the payments. His contentions are supported in some degree by the testimony of Maley and by Peter M. Scott, a lawyer for Georgantones, who drew up the papers when the mortgage was later renewed. Also, defendant had receipts and cancelled checks for most of the payments. This is not to say that the physical acts of defendant in paying would require a finding that it was his money; but it is of some inferential value in that connection, particularly when plaintiffs were able to produce almost no receipts for moneys which they claim to have paid.

Also to be considered as to the intention of the parties is the testimony of several of the plaintiffs that they did not contribute money after they moved from the house. If they considered themselves part owners of the house, they must have realized that it was their obligation to help make the payments whether they lived in the house or not. We must affirm the trial court in its decision that no trust resulted from the transactions accepted as proved by the trial court.

The trial court must also be affirmed in its decision that there was not a sufficient showing of unjust enrichment to allow for the engrafting of a constructive trust on the property.[3] The theory of unjust enrichment is based on what the person allegedly enriched has received, not on what the opposing party has lost. In the case at bar, accepting the evidence which supports the judgment—as we must—defendant furnished a home for the family. He also contributed a part of the food bill. In exchange, he received food and lodging. From the evidence, he contributed as much as any of the others and received no more.

However, plaintiffs contend that defendant contributed no more in cash than did some of the plaintiffs, and that by the decision of the trial court he will receive title to the house. It should be noted that defendant assumed the liability of the mortgage and the promissory note. It so happens that property values measured by the purchasing power of the present inflated dollar have increased tremendously since the time the house was bought; but, if the reverse had happened, defendant would have been personally in debt. This is not an inconsiderable consideration. The father had lost a house he had purchased and he had debts outstanding. In fact, plaintiffs state that this was the reason for putting title in defendant's name. Defendant testified that Alex said he "would not assume that responsibility." We hold that the trial court is affirmed in its decision that there was no constructive trust based on unjust enrichment.

---

[3] For a discussion of the general rule, see Knox v. Knox, 222 Minn. 477, 25 N. W. (2d) 225.

By plaintiffs' own testimony, there was no failure to disclose on the part of defendant. This contention by plaintiffs on this appeal is frivolous. Helen testified that she learned from other members of the family that the final price was $4,800, and she must have known how much the down payment was, as she claimed to have contributed to it. Paul testified that the asking price of $4,800 was reported by defendant. Patrick testified similarly. This is sufficient to show that there was no failure on the part of defendant to disclose the final asking price for the house. Since there was no failure to disclose, there was no fraud shown and so no constructive trust on that ground.[4]

Defendant admitted that Helen made payments on the house after the lawsuit was commenced. However, defendant also testified that none of the plaintiffs living in the house paid rent to him during that period. He said that the reasonable value for rental was $15 a month each. Three of the plaintiffs were living in the house, and later Helen's husband moved in. Even if acts after the commencement of the lawsuit were to be considered, the lower court must be sustained in holding that plaintiffs have no claim against the property.

■ Before trial plaintiffs moved that certain fact questions be submitted to a jury. The court denied the motion. This is an equitable action, but plaintiffs contend that denial of the motion was an abuse of discretion by the trial court. The proposed questions for the jury likewise are of an equitable nature and did not involve legal claims. Without citing them here, all the cases cited by plaintiffs are authority only for the proposition that in an equitable action it is within the discretion of the trial court to submit some questions of fact to the jury. No case held that either of the parties has a right to trial by jury on equitable matters. Furthermore, the transactions testified to were so detailed and so many documents were introduced in evidence that decisions on the proposed questions would have been very difficult for a jury. We can find no

[4] As to the general rule on this question, see Nester v. Gross, 66 Minn. 371, 69 N. W. 39.

grounds and no authority for holding that the court's action was an abuse of discretion. We hold that denial of the motion was within its discretion. Morton Brick & Tile Co. v. Sodergren, 130 Minn. 252, 153 N. W. 527.

The order and judgment of the trial court are in all things affirmed.

[1]Reported in 54 N. W. (2d) 118.