In the Matter of the WELFARE OF C.K. and K.K.

No. C9–87–1672.

Supreme Court of Minnesota.

July 1, 1988.

apolis, for Hennepin County Bureau of Social Services.

David Piper, Minneapolis, for Mother.

Eugene Stein, Minneapolis, for Father.

Wright Walling, Minneapolis, guardian ad litem.

KELLEY, Justice.

In June 1986, the Hennepin County Bureau of Social Services (Hennepin County) petitioned the Hennepin County Juvenile Court seeking an order terminating the parental rights of Elaine and Dennis Keith to K.K. and C.K., their two youngest children who in 1982 had been adjudged dependent and neglected pursuant to Minn.Stat. § 260.015, subd. 10(e) and who ever since had been in foster homes. The petition alleged numerous and serious failures regarding the compliance of both parents with court ordered treatment programs and interaction between the parents with the affected children or those responsible for the children's care. On July 27, 1987, the juvenile court denied the petition for termination and, in effect, structured a program which within a few months would ultimately return the two children to the parental home.[1] After the court of appeals denied Hennepin County's petition for a writ of prohibition for a stay of the juvenile court order, we granted a stay of the July 27, 1987, order and likewise granted accelerated review. We now remand for further proceedings.

Respondents Elaine and Dennis Keith have seven children ranging in age from 8 to 20 years. The history of child abuse in the home has been both severe and prolonged. In an order dated September 17, 1982, the Hennepin County Juvenile Court

Thomas L. Johnson, Hennepin Co. Atty., Deonne Parker, Asst. Co. Atty., Minne-

1. In addition to denying the termination petition, the court ordered: Unsupervised visitation between respondents C.K. and K.K. for a minimum of one day per week during August, 1987, and thereafter for two weekends at respondent's home during the month of September 1987. Additionally, it ordered that C.K. and K.K. be returned to the physical custody of respondents commencing in October 1987 subject to such monitoring as deemed necessary by Hennepin County Social Services officials. Thereafter, assuming receipt from Hennepin County of a satisfactory progress report, the court further ordered that legal custody of the children be returned to respondents. Finally, the juvenile court excused both Dennis and Elaine Keith from further participation in any counseling.

found all seven children dependent and neglected pursuant to Minn.Stat. § 260.015, subd. 10(e) (1982).[2] The court found extended physical abuse of the children by Dennis Keith over the preceding seven years, and that Elaine, although aware of the abusive behavior of her husband toward the children, took no steps to effectively protect the children. The documented abuse to which these children had been exposed by Dennis Keith is almost incredible.[3]

The respondent Elaine Keith has not herself escaped Dennis Keith's physical abuse. On one occasion, Dennis Keith broke her collarbone, her jaw, and cut her scalp with a broken beer bottle. On another, he slept with a bowie knife causing Elaine to fear her own decapitation. The children often were afraid to go to sleep before their parents retired after the latter had been quarreling for fear their mother might be hurt. All these instances of familial abuse were before the court in 1982 when it found the children dependent and neglected and placed them in foster homes.

Thereafter, in various orders the Hennepin County Juvenile Court ordered treatment and residential programs for the children, a type of rehabilitation program with specific goals for the mother, restored supervised visitation with the father, and conditioned the return of the children to either or both parents only upon the unanimous concurrence of a team of specified "experts." Likewise, periodic progress reviews were ordered. During the next five years nearly 40 juvenile court orders were issued concerning the problems of this family.

Since October 1982, K.K. and C.K. have been in foster homes, and since the spring of 1983 have resided with the same foster family.[4] During 1983 allegations of Dennis Keith's sexual abuse of K.K. and C.K. first surfaced. Following that revelation the juvenile court found that Dennis Keith had indeed sexually abused the two when, on at least one occasion, he had placed his penis in the genital area of each child and either urinated or ejaculated upon them. Immediately, even the prior limited visitation privileges of Dennis with the two children were cancelled, and the court ordered that until successful completion of treatment for sexual offenders had been completed, Dennis Keith could have no further contact with the two children.

Also, in 1982, Dennis Keith was convicted of assault in the second degree for the acts of physical abuse committed against his children. The sentencing court originally stayed his five-year sentence and ordered him to serve the first year of the stayed sentence at the Hennepin County Adult Corrections Facility. Later, he was granted an indefinite furlough from the Adult Corrections Facility for the purpose

2. Minn.Stat. § 260.015, subd. 10(e) (1982) stated:

Subd. 10. "Neglected child" means a child:

* * * * * *

(e) Whose occupation, behavior, condition, environment or associations are such as to be injurious or dangerous to himself or others; or

* * *.

(This provision is currently codified at Minn. Stat. § 260.15, subd. 10(f) (1986)).

3. On at least one occasion, after positioning a tow chain over a roof beam, he forced five of the children to stand on stools and placed the chain around their necks as he threatened to kick the stool from underneath each child. On another occasion he hung one child from a chain by the child's belt loop. On another, he chased a child with a bowie knife and held it to the child's throat. He beat the same child with a belt causing bruises on her back, thighs and breasts to the point the child feared death. He kicked a son in the abdomen and on another occasion threw the boy in the air allowing him to fall unrestrained to the ground resulting in a stunned or "knocked out" condition. He forced young children to go out of doors with no shoes and clad only in nightgowns when the January wind chill was −80° F. He intentionally smashed one daughter's face into a counter causing her nose to bleed, and causing swelling and bruising. At various other times he had hit all children with his belt, and resorted to pulling out their hair as a form of discipline. On one occasion, though the child was then of very tender years, by pulling out K.K.'s hair he caused her to have a bald spot.

4. The other five Keith children, at one time or another, and for one reason or another, have been returned to the Keith home, and at the time of the hearing involved in this case were either emancipated and/or living at home.

of entering treatment at Alpha House, a long-term therapeutic program that treats sex offenders or physically assaultive offenders. Shortly thereafter, within three days, Dennis Keith absconded from Alpha House resulting in revocation of the stayed execution of sentence and his incarceration in the St. Cloud Correctional Facility for men. At the facility inmates had access to a program known as RESHAPE, a treatment program designed for those having problems similar to those of Dennis Keith. Although Dennis Keith commenced participation in the RESHAPE program, after approximately six months, and before completion, his participation was terminated because he refused to address the issues his program workers deemed important for his treatment. Eventually he was released from the St. Cloud Correctional Facility in April 1984.

Shortly after release from the Correctional Facility, the juvenile court ordered that Dennis Keith undergo psychological testing and evaluation at the McZiel Clinic. Between June and November, 1984, Keith attended approximately twelve sessions with a psychologist, Dr. McKowen, who viewed Keith as chemically dependent on alcohol. Though two juvenile court orders required Dennis Keith to remain "chemically free," the record is equivocal about the extent to which he has refrained from drugs or the use of alcohol. Initially, he did participate in a brief one-month alcohol treatment program at Anoka State Hospital. While there, he cooperated with that program and completed it to the satisfaction of the institution. However, two years later Keith was convicted on a DWI charge, which resulted in revocation of his driver's license. In order to secure reinstatement of his license, he did attend Alcoholics Anonymous, and underwent treatment for alcoholism from the Harley Treatment Center. Following completion of the treatment, Keith's driver's privileges were restored by the issuance of an Alcoholics Anonymous card which validates the license only if there is abstinence from the use of alcohol or narcotics. Thereafter, the extent to which Keith has addressed his alcohol problem remains somewhat unclear.

Notwithstanding that Dennis Keith in 1985 was ordered by the juvenile court to obtain treatment designed for sex offenders, he never participated in any program. In fact, he has never acknowledged those offenses against K.K. and C.K., and the farthest he has gone is to concede that if the children believed the sexual abuse occurred, someone would have to "take a look at that."

As required by the October 20, 1982 juvenile court order, Elaine Keith attended and successfully completed the Domestic Abuse Project (D.A.P.). However, she failed to follow through with additional counseling which had been recommended by the D.A.P. and required by order of the juvenile court. Later, when Dennis had been diagnosed as a chemically dependent person by Dr. McKowen, Elaine was diagnosed as a "co-person to dependency," after which she did attend a few co-person lectures and an indefinite number of Alanon meetings. To some extent she also participated in some phases of Dennis's treatment program for alcohol dependency by attending approximately five family meetings at Anoka State Hospital, as well as a few family counseling sessions at the Harley Treatment Clinic. In June 1984, Elaine Keith herself began counseling sessions addressing family problems with Dr. McKowen. She attended some sessions alone, others with Dennis, or with some of the children. This counseling continued on an intermittent basis until May 1987, except for a 20–month hiatus which occurred following Dr. McKowen's discovery that Elaine had withheld information regarding her husband's use of alcohol and the DWI conviction.

In 1986, the juvenile court ordered that Elaine complete a treatment program designed for mothers of incest victims. Not only did she not comply, but, in fact, expressed her disbelief of K.K.'s and C.K.'s allegations concerning Dennis's sexual abuse of them.

Trial testimony at the 1987 hearing revealed no physical abuse nor alcohol use in the Keith home. Dr. McKowen, who had consulted with and treated the parents intermittently, as described, opined that it

would be safe to return K.K. and C.K. to the Keith home. That stated conclusion was directly contradicted by his opinion given later on in his testimony that these young children should not be returned to the home wherein resided an untreated sex offender such as Dennis Keith.

Since 1982 while K.K. and C.K. have been living in foster homes there has been little or no visitation by the parents. During most of the time Dennis had been in institutions or denied visitation, and Elaine's efforts at visitation have been minimal. The children themselves apparently did not welcome visitation as evidence existed that, at least on one occasion, they had advised their guardian ad litem they did not want to participate in a one-time supervised visitation that had been arranged with their mother.

By 1986 only the four youngest children were still minors. That year Hennepin County moved to terminate the Keiths' parental rights to those four. Although that motion was ultimately denied, an experienced juvenile court judge ordered that the case plans previously set for the parents should remain in effect, and limited continued visitation by Elaine with each of the four by making it contingent upon the children's wishes as well as upon the approval or participation of each child's therapist. Visitation between Dennis and the children was suspended by the judge until Dennis evidenced a clear and convincing understanding of the ill effects of child abuse, and then only after interview with the child's therapist. The case plan goals for

the mother also then included successful completion of a program for mothers of incest victims. More importantly, the case plan goals for the father included his successful completion of a program for sex offenders. Just four months later a different experienced juvenile judge, after reviewing the extensive case history, reaffirmed that order. The issues we are asked to address today arise from an order entered just eight months later by a third juvenile judge, who, though coming in contact with the case for the first time, seems to have rejected, in the main, the numerous, and substantially similar, findings of judges in prior hearings as well as their conclusions.

The petition of Hennepin County to terminate the parental rights of K.K.'s and C.K.'s parents alleged that rehabilitation efforts for more than four years had failed to correct the Keith home conditions that had originally led to the dependency and neglect determination in October 1982. That fact, the petition asserted, when combined with the fact that court directed efforts to alleviate the underlying causes of physical and sexual abuses had failed, established the existence of statutory grounds justifying the granting of the petition. Minn.Stat. § 260.221(b)(2), (4), (5), and (7) (1986).[5] In passing upon the sufficiency of a petition for termination of parental rights, the juvenile court must evaluate whether the parents are "presently able" to assume child care responsibilities. *In re Linehan,* 280 N.W.2d 29, 31 (Minn.

---

5. Insofar as applicable, the statute provides:
   The juvenile court may, upon petition, terminate all rights of a parent to a child in the following cases:

   * * * * * *

   (b) If it finds that one or more of the following conditions exist:

   * * * * * *

   (2) That the parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship, including but not limited to providing the child with necessary food, clothing, shelter, education, and other care and control necessary for the child's physical, mental or emotional health and development, if the parent is physically and financially able; or

   * * * * * *

   (4) That a parent is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be permanently detrimental to the physical or mental health of the child; or

   (5) That following upon a determination of neglect or dependency, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination; or

   * * * * * *

   (7) That the child is neglected and in foster care.

1979). The parents' rehabilitation, or lack thereof, during all periods from the time of adjudication of dependency and neglect leading up to the termination hearing is relevant to the court's ultimate decision. *In re Welfare of Clausen*, 289 N.W.2d 153, 156 (Minn.1980). Likewise, "the foreseeable permanency of the inability of the parent is a relevant factor in determining whether reasonable efforts have failed to correct the conditions leading to the neglect adjudication." *Id.* at 155. *See also In re Welfare of Barron*, 268 Minn. 48, 53, 127 N.W.2d 702, 706 (1964); *In re Welfare of Kidd*, 261 N.W.2d 833, 835 (Minn.1978).

■ The petitioner, here Hennepin County, bears the burden of producing clear and convincing evidence that one or more of the statutory termination grounds exists. *In re Welfare of Clausen*, 289 N.W.2d 153, 155 (Minn.1980); *In re Welfare of Rosenbloom*, 266 N.W.2d 888, 889 (Minn.1978). Moreover, this "burden is subject to the presumption that a natural parent is a fit and suitable person to be entrusted with the care of his child and that it is ordinarily in the best interest of a child to be in the custody of his natural parent." *Clausen*, 289 N.W.2d at 156. While this presumption is not to be lightly disregarded, and although the petitioner carries a heavy burden to overcome it, nevertheless if the evidence as a whole clearly demonstrates that the best interest of the child demands a different disposition, the best interest of the child must prevail. An important factor entitled to weighty consideration in arriving at that determination is the effect of long-term foster care provided the affected child. *In re Welfare of J.J.B.*, 390 N.W.2d 274, 279–80 (Minn.1986).[6] The seriousness of the consequences of a decision in a parental termination proceeding, as well as the necessity of assuring that a reviewing court be afforded the benefit of the reasoning prompting the juvenile court disposition, undoubtedly motivated the legislature to specifically mandate that precise written findings be made.[7]

The reviewing court's function is to determine whether the juvenile court findings address the requirements of Minn.Stat. § 260.221(b), are supported by substantial evidence, and are not clearly erroneous. *Clausen*, 289 N.W.2d at 156; *In re Welfare of J.M.S.*, 268 N.W.2d 424, 428 (Minn. 1978). To properly perform its function in reviewing termination proceedings, as in cases involving other family matters, a reviewing court must have before it clear written findings. *See e.g., Pikula v. Pikula*, 374 N.W.2d 705, 713 (Minn.1985); *Moylan v. Moylan*, 384 N.W.2d 859, 865 (Minn.1986).

■ The order denying Hennepin County's termination petition is deficient in detailing those factual findings upon which the court relied when it denied the petition

---

6. We observed in *In re Welfare of J.J.B.*, 390 N.W.2d at 279, that the judicial system must be sensitive to, and take cognizance of, the disruption experienced by small children who, after being abused and neglected, are later lodged in foster homes with virtual strangers, often moving from one foster home to another, or alternatively, as here, remaining with the same family over a lengthy period during which they may form important "familial" bonds. Children remaining for lengthy periods in foster homes frequently are never returned to the biological families. Juvenile courts reviewing evidence in such cases have the difficult task of determining the disposition that will most effectively promote the child's best interests under all existing circumstances, even if in making the appropriate disposition the biological parents' rights must yield. *Id.* at 280. *See generally* Musewicz, *The Failure of Foster Care: Federal Statutory Reform and the Child's Right to Permanence*, 54 S.Cal.L.Rev. 633, 646 (1981).

7. Minn.Stat. § 260.191 (1986) in relevant part provides:

260.191 **Dispositions; Children who are abused, neglected, dependent, or neglected or in foster care.**

\* \* \* \* \* \*

Subd. 1a. Written findings. Any order for a disposition authorized under this section shall contain written findings of fact to support the disposition ordered, and shall also set forth in writing the following information:
(a) Why the best interests of the child are served by the disposition ordered;
(b) What alternative dispositions were considered by the court and why such dispositions were not appropriate in the instant case; and

\* \* \*.

and ordered the return of K.K. and C.K. to the parental home. We find this omission to be particularly troublesome because the order appealed from was issued within one year from the time one experienced juvenile judge had refused similar relief and within eight months from the time a second experienced judge likewise had refused even visitation privileges to the Keiths with these two children; had ordered the Keith parents to participate in programs designed for sex offenders and victims of sex offenders; and had denied the return of the two children to the Keith's parental home because doubt existed whether the Keith parents had complied with or benefited from previous court mandated case plans. In particular the order contains insufficient findings based upon the record as to the present status and circumstances in the parental home, *see Linehan*, 280 N.W.2d at 31. It also lacks specific findings relative to the degree of successful completion by the parents of court-ordered rehabilitative treatment, *see Clausen*, 289 N.W.2d at 156. In fact, the juvenile court implicitly acknowledged that home conditions had not substantially changed in the intervening five years, but opined that the parents had benefited from the court ordered plans to the extent that "the devastating mistake" relative to the sexual abuse of K.K. and C.K. would not occur again—a prognostication of questionable soundness when considered in the light of Dr. McKowen's testimony. Though the juvenile court acknowledged the "best interest of the child" consideration was of paramount importance, it seemingly either ignored or afforded but slight weight to the fact that these two children had been in foster homes for a long period of time—most of their lives. *In re Welfare of J.J.B.*, 390 N.W.2d 274. Accordingly, we are left with the impression it considered that factor, as well as the expressed wishes of the two children, to be of relatively little or no importance when compared to the parent's "rights." Absence of specific factual findings supporting its conclusion that Hennepin County had failed to sustain its burden of demonstrating that the circumstances giving rise to the original abuse still existed leaves us with the impression that, in truth, the juvenile court's conclusion subordinated the best interest of these children to the "rights" of the parents.

From the first revelation of these family problems in 1982 to the time of the 1987 hearing, the record contains repeated instances demonstrating the unreliability of each parent in truthfully reporting his or her conduct or that of his or her spouse. During this time each has consistently questioned either that the sexual abuse of these two children existed or that, if it did exist, that it was serious. With one exception, the testimony of all the professionals,[8] who had attempted to help and guide the parents, was that the parents had not received any substantial benefit from court ordered plans for rehabilitation primarily because of failure to follow through to completion. The limited factual findings fail to substantiate legitimate excuses justifying that failure.[9]

The only evidence substantially supporting the trial court's conclusion that conditions in the Keith family home had so changed as to justify returning those two children into that home came from the five

---

8. Dr. McKowen offered the opinion that Mrs. Keith, in particular, had received some benefit, and that Mr. Keith had benefited from his chemical dependency treatment. He did say that the children could safely return to the home. He did admit, however, that they should not be returned to the home of an untreated sex offender. Dennis Keith has not only rejected treatment, he denies that the sexual abuse even occurred.

9. Although all costs of evaluation, diagnosis, therapy, and rehabilitation for the parents was paid for by the county, the juvenile judge excused the parents' lack of diligence and coopera- tion in completing the treatment programs and family planning programs because of their "economic circumstances." During most of this period of time Elaine was employed at a factory job. Undoubtedly it may have been difficult for her to attend all sessions scheduled, but the record discloses that when the option presented itself, she not infrequently seemed to have priorities inconsistent with re-establishment of normal family relationships. Insufficient findings on this issue do not permit us to hold the trial court's determination was not clearly erroneous.

Keith children who, for one reason or another but not as the result of a court order, had returned to the Keith home. Of course, it is the trial judge's function to determine the credibility of witnesses, and only on the rarest of occasions will a reviewing court override that determination. *Georgopolis v. George,* 237 Minn. 176, 182, 54 N.W.2d 137, 141 (1952). However, when, as here, that evidence came from children who for most of their lives had been physically abused by their father and who had themselves never volunteered to report the continued abuse, it would be most helpful to a reviewing court to have the benefit of findings articulating the trial court's reasoning for implicitly rejecting reports and findings in a number of prior court orders affecting this family that the children lived in constant fear of their father.[10] The trial testimony of these children may be thoroughly credible, but a reviewing court would be aided in its function by explanatory findings.[11]

The lack of findings substantiating the conclusion that the parents have complied with rehabilitative case plans—particularly the lack of evidence supporting any compliance with case rehabilitation plans ordered after the surfacing of the sexual abuse, as well as lack of findings substantiating a conclusion that it is for the best interest of these two children to return them to this environment, which during all the times of their life in the home has been one of gross child abuse—makes it literally impossible

under appropriate review standards for this court on this appeal to make a determination, with any degree of certainty, that the juvenile court's disposition was not clearly erroneous. Therefore, we remand to the juvenile court with direction to make findings addressing the requirements of Minn.Stat. § 260.191, subd. 1a(a), (b), (c) (1986), as interpreted by this court in the cases herein cited. Although we remand for further findings, we stay this appeal, retain jurisdiction, and order the juvenile court's findings following remand to be transmitted directly to this court. *Accord, State v. Wicklund,* 295 Minn. 402, 201 N.W.2d 147 (1972).

Remanded.

WAHL and COYNE, JJ., dissent.

WAHL, Justice, dissenting.

I agree with the majority opinion in every respect except the disposition. Under the facts and circumstances of this case, it is unconscionable to prolong these proceedings with a remand. The decision of the trial court denying the petition for termination of parental rights was clearly erroneous.

All seven children of this family were removed from the parental home in 1982, on the finding of the court that there had been seven or eight years of abuse of those children. K.K. was four years old; C.K. was two at that time. They have now been out of the home of the parents for six

---

10. Courts should not be so blind as to fail to recognize the unpleasant but pervasive pressures on children who are called to testify in these types of judicial proceedings—pressure generated, on the one hand, by potential parental wrath if the testimony adversely reflects on the parent, or, on the other hand, apprehension of being removed from a known, less than ideal environment to one that is completely unknown. We have no reason to conclude that the trial court failed to consider that pressure when evaluating the children's testimony.

11. Responding to a contention advanced by the mother's lawyer that "uncontroverted evidence" —essentially emanating from the children living in the home, existed demonstrating a complete changed home environment than the one existing six years previously, the Hennepin County Attorney's office attempted to file with this court transcripts of ex-parte post-trial interviews

with family members purporting to show continuing incidents of physical abuse and use of alcohol. The Hennepin County Attorney's office knew, or, at least should have known, this procedure was highly improper. The proper forum to consider allegations that surfaced after the hearing was the juvenile court. We condemn this patently clear violation of rules governing appellate procedure, and, as well, the violation of the parents' due process rights. Needless to iterate, we considered *none* of the inappropriately submitted materials in arriving at our decision. However, if those allegations are properly presented to the juvenile court in a manner affording the parents cross-examination and rebuttal opportunities, the trial court on remand is free to consider them together with all other evidence in shaping appropriate findings.

years. Judge Oleisky, an experienced juvenile court judge, by order dated September 27, 1985, found that both K.K. and C.K. had been sexually abused by the father. The court ordered that there be no contact between the father and these two children until the father had successfully completed the treatment program for sex offenders. The record shows lack of treatment for and denial of sexual abuse by the father. The mother has consistently identified with the interests of the father rather than with the interests of the children.

On the face of this record the trial court here required no treatment. The only expert who tells us it is safe to return the children to the parental home is the same expert who testified at trial that young children should not be returned to an untreated sex offender. The time has come to determine "what action most readily promotes the best interests of the child." *Matter of Welfare of J.J.B.*, 390 N.W.2d 274, 280 (Minn.1986). The courts have exercised judicial caution long enough. The best interests of K.K. and C.K. require reversal and the granting of the petition to terminate parental rights. I would so hold.

COYNE, Justice (dissenting).

I join in the dissent of Justice Wahl.