Mary Ann USELMAN, Barbara Sundby, Mark Uselman, Jane Uselman, Nicolette Montgomery, & Philip Uselman, individually, and Mark Uselman, as a shareholder of Usie Corporation, a Minnesota corporation and Uselman's, Inc., a Minnesota corporation, Appellants (C9-89-1093),

v.

Jerry L. USELMAN, individually, as President and sole director of Usie Corporation, a Minnesota corporation, and as a former officer and director of Uselman's, Inc., a Minnesota corporation; George J. Uselman, individually, as a former officer and director of Usie Corporation, a Minnesota corporation, and as an officer and director of Uselman's, Inc., a Minnesota corporation; and Norwest Bank Minneapolis, N.A., formerly known as Northwestern National Bank of Minneapolis, trustee for the Nicholas Uselman Trust Agreement, Respondents,

and

Carol A. O'Toole, Non–Party Appellant (C0–89–1094).

Nos. C9–89–1093, C0–89–1094.

Supreme Court of Minnesota.

Dec. 14, 1990.

James H. Kaster, Jeffrey Anderson, Minneapolis, for Mary Ann Uselman, et al.

David F. Herr, Mary R. Vasaly, Minneapolis, for Carol A. O'Toole.

Thomas S. Fraser, Minneapolis, for George & Jerry Uselman.

Robert L. Meller, Jr., Minneapolis, for Norwest Bank.

Corey J. Ayling, Minneapolis, for amicus curiae, Civil Lib. Union.

Robert Hicks, MN. Civil Lib. Union, David L. Lillehaug, Minneapolis, amicus curiae, for MN. State Bar Assoc.

Peter W. Riley, Minneapolis, amicus curiae, for MN. Trial Lawyers Assoc.

Mark M. Nolan, St. Paul, amicus curiae, for Certified Trial Lawyers of MN.

WAHL, Justice.

We accelerated review of judgments entered in favor of defendants Jerry L. Uselman, George J. Uselman and Norwest Bank on the merits of the complaint and amended complaints of plaintiffs Mary Ann Uselman, et al. for the purpose of considering within the context of this appeal the propriety of the trial court's imposition of sanctions and costs in the aggregate amount of $190,200 against plaintiffs' counsel Carol O'Toole pursuant to Minnesota Statute Section 549.21 and Minn.R.Civ.P. 11.[1] We consolidated separate appeals of the plaintiffs and O'Toole and affirm the judgment against the plaintiffs and reverse the award of sanctions imposed against O'Toole.

Attorney Carol O'Toole was retained by plaintiffs Mary Ann, the surviving spouse of Nicholas, and their five children and she commenced this action on April 3, 1984 to obtain rescission of the sale of the stock held by Nicholas but transferred on his death to the trust administered by Norwest. In essence, they claimed that the bank had breached its fiduciary duty and was negligent in selling the stock for less than its fair market value. As to the defendants Jerry Uselman and George Uselman, the plaintiffs raised specific claims of conversion of corporate assets, misappropriation, breach of fiduciary duty and misrepresentation and sought disgorgement of monies wrongfully taken or, as an alternative, compensatory damages as well as punitive damages. The facts underlying this controversy may be briefly stated.

On October 14, 1971, Nicholas Uselman executed an insurance trust agreement, naming Northwestern National Bank of Minneapolis (now Norwest) as trustee. The agreement provided that Nicholas would designate Norwest as beneficiary under certain insurance policies and would authorize Norwest to receive and distribute all property transferred to the trust. Upon Nicholas' death, Norwest was to distribute the income from the trust to his surviving spouse Mary Ann on a periodic basis. Mary Ann and Nicholas' children held contingent and remainder interests in the trust.

Nicholas' last will and testament, also executed on October 14, 1971, devised the residue of his estate to Norwest as trustee, nominating Norwest as executor and providing that Mary Ann could become a co-executor if she so desired. Nicholas died on April 11, 1975. The bulk of his estate

---

1. While the merits of the underlying substantive decision are important to the litigants and must be considered by this court in identifying and considering possible bases for sanctions against counsel, they are not of the nature which would ordinarily invoke our extraordinary powers to accelerate review. See Minn.R.Civ.App.P. 118. Review of those substantive issues is appropriate, however, to facilitate disposition of the issues relating to the sanctions imposed.

was shares of stock in the family's closed corporations, Uselman's, Inc., an International Harvester and truck dealership (the Dealership), and Usie Corporation, a real estate holding company (Usie). Usie, formed in 1969 by brothers George, Nicholas and Michael Uselman, owned the Dealership properties, a separate commercial building and a farm. As of January 4, 1975, there were 920 Dealership shares outstanding, of which Nicholas held 315 shares (34%) with the remainder held by other Uselmans, George (540 shares—59%), Jerry (35 shares—4%), Michael (25 shares—3%) and Nicholas' son Mark (5 shares—1%). On August 12, 1974, there were 250,000 Usie shares outstanding, of which Nicholas held 34,000 shares (14%), with the remainder held by George, (147,500 shares—59%), Michael (30,167 shares—12%), Jerry (20,667 shares—8%) and Mark (17,666 shares—7%).

Luther Nervig, an attorney who probated the will and who allegedly at times also represented the family corporations, recommended that Mary Ann and her son Mark Uselman serve as co-executors. Accordingly and apparently at Nervig's suggestion, Norwest waived its right to act as administrator and executed a declination to file with the petition for allowance of the will. The proceeds of Nicholas' insurance policies, approximately $46,000, were paid to Norwest several months after his death. However, the Wadena County Probate Court did not issue its decree distributing the shares to Norwest as trustee until December 5, 1979, nearly 4½ years after Nicholas' death. During this interim, Mary Ann received no salary, bonuses, dividends or any income from the shares held by the estate. In addition, despite detailed procedures for the sale of corporate stock contained in Usie's articles of incorporation,[2] no sale of any of the stock occurred until almost 5 years after Nicholas' death. It should also be noted that despite Norwest's declination of its appointment as executor, it actively involved itself in all sales negotiation; its trust officer met with all parties on several occasions and, it arranged in 1981, at plaintiffs' request, to obtain an independent real estate appraisal of the Usie properties.

The separate trust agreement, on the other hand, gave Norwest the unqualified right to sell the shares without the approval of any court or person. It thus executed redemption and purchase agreements without the assent of the beneficiaries. There were ultimately two separate stock sales representing Nicholas' interest in the separate corporations: on January 21, 1980, approximately one month after the stock was decreed to the trust, Norwest and the Dealership executed a redemption agreement whereby the corporation repurchased the 315 shares for $319.38 per share.[3] On April 25, 1983, Norwest and Usie executed a stock purchase agreement whereby Usie repurchased 34,000 shares at $1.32 per share, later increased by approximately $.44 per share for a total purchase price of $59,700. That agreement was executed by Jerry as president and secretary-treasurer of the corporation. That history served as the predicate for this action.

Recognizing the considerable sanction imposed on counsel, we find it necessary to detail the extensive pre-trial proceedings in

---

2. Usie's articles of incorporation, filed with the secretary of state, contained a right of first refusal provision. Article XII stated, "Any holder of common stock * * * and the executor or administrator of any deceased holder of common stock, if desirous of selling * * * all or any of such shares * * * shall first deliver to the president or treasurer of the corporation written notice of such desire to sell or transfer." This article also detailed a procedure whereby five appraisers would be selected to determine the stock's value and directed those appraisers to "use fair market value rather than book value in determining the value of assets." The corporation would then have an 18–month option to purchase the shares at the appraised value.

While the dealership executed an amendment to its articles containing a provision similar to Article VII, it was never filed with the secretary of state.

3. This amount represented 80% of the Dealership's 1975 book value of $338,815. The book value on October 31, 1979 was $633,430. The terms of the agreement called for 10% down, the remainder to be paid in yearly installments of $10,000. The corporation executed a promissory note for the balance of $90,604.70 with an 8% annual interest rate. The Dealership later closed its doors and liquidated its assets in March 1983.

which the parties and two successive trial judges engaged during the period from the filing of the complaint on April 3, 1984 and the commencement of trial on February 1, 1988. The multiple and often duplicative motions provided the court with several opportunities to caution counsel if it identified circumstances warranting sanctions or to simply dismiss the complaint—it did neither. Included in these motions were the plaintiffs' two attempts to amend their complaint, Norwest's motion for a stay and a series of motions by defendants for dismissal or summary judgment of all or portions of the plaintiffs' complaint. By the time the first pre-trial judge's participation was completed, the defendant Norwest's motion to deny the plaintiffs' demand for a jury trial had been granted subject to the empaneling of an advisory jury and the plaintiffs had been cautioned about their burden of proof with regard to their punitive damages claim. Issues for trial had been narrowed considerably and defendants' motions to dismiss the Uselman children as plaintiffs had been denied on the basis of their present and contingent interests in the trust. Finally, defendants' summary judgment motions were denied on the basis that genuine issues of material fact existed with regard to allegations relating to misrepresentations, breaches of fiduciary duty, failure to activate buy-sell agreements and failure to seek outside purchasers.

Then, after the second trial judge was assigned, defendants unsuccessfully renewed their motion for summary judgment. Shortly before trial, the defendants Uselman filed a motion to deny the plaintiffs' demand for a jury trial with regard to any claims against them, asserting that beneficiaries suing third parties for an injury to a trust are maintaining an action in equity and therefore not entitled to trial by jury. Almost simultaneously, Norwest filed its third motion for summary judgment and sought to exclude proposed expert testimony. The trial court, among other orders, quashed the plaintiff's jury trial demand, denied the defendants' motion to exclude plaintiffs' expert witnesses and granted Norwest's motion to exclude testimony regarding its declination to act as executor of the estate.

During the course of trial, the plaintiffs called three experts whose testimony was designed to establish the existence of a duty and its breach by Norwest and to value the stock sold by Norwest. Defendants offered their own valuation experts. The testimony, while extensive, is not critical to a resolution of the issues on appeal. We do note, however, that plaintiffs' counsel moved the trial court to recuse or for a mistrial during the proceedings based upon attitudes and comments of the court throughout. The motions were denied. Ultimately, the court returned a verdict in favor of the defendants.

Plaintiffs then sought post-trial relief in the alternative form of a new trial or for amended findings. The trial court denied the motions, and then the two judges who had presided over the pre-trial and trial proceedings met to consider the defendants' motion for the imposition of sanctions against counsel based upon the filing of the second amended complaint. Relying upon its finding that O'Toole had violated Minn.R.Civ.P. 11 and Minn.Stat. § 549.21 by asserting claims that were frivolous and costly to the other parties, the trial court imposed a sanction in the amount of $83,500 against O'Toole in favor of the defendants Uselman and a $106,700 sanction against O'Toole in favor of defendant Norwest. This appeal followed.

In identifying the context in which the sanctions were awarded, we first address the substantive issues on appeal, beginning with the plaintiffs' claim that the trial court erred by denying them a right to a trial by jury.

1. *Entitlement to a Trial by Jury.* As we have indicated, the first pretrial judge agreed to empanel an advisory jury, seemingly recognizing that the case presented difficult questions of fact to be resolved by a jury. By the time the action was tried, the issues had been narrowed and the court then struck the demand for a jury trial, believing not only that the action was equitable in nature, but also that the complex

issue of stock valuation was an area traditionally reserved to the court.

The question of entitlement to a jury trial may be difficult to resolve when the pleadings facially demonstrate mixed issues at law and equity. The trial court's inquiry thus often requires a scrutiny beyond the parties own characterization of the issues. *See Landgraf v. Ellsworth,* 267 Minn. 323, 327, 126 N.W.2d 766, 768 (1964); *see also Sina v. Schifsky,* 296 Minn. 528, 529, 208 N.W.2d 302, 303–04 (1973). Of course, Minnesota Constitution article I, Section 4 guarantees the right to a jury trial in all cases at law and similarly, Minn.R.Civ.P. 38.01 provides, "In actions for the recovery of money only, or of specific real or personal property, the issues of fact shall be tried by a jury."

 By the time of trial, the only claim outstanding against Norwest was for breach of its fiduciary duty as trustee; the plaintiffs' claims of intentional and negligent misrepresentation had been dismissed. When causes of action at law are dismissed and only equitable claims remain, a party is not wrongfully deprived of a jury trial. *See, e.g., Geo. A. Hormel Co. v. First Nat'l Bank,* 171 Minn. 65, 70, 212 N.W. 738, 740 (1927). While actions for a breach of trust lie in equity and the trial court may, in its discretion, submit any questions of fact to a jury, *Georgopolis v. George,* 237 Minn. 176, 186, 54 N.W.2d 137, 143 (1952), the general rule is that "the remedies of the beneficiary against the trustee are exclusively equitable." *Restatement (Second) Trusts* § 197 (1959); *see, e.g., First Alabama Bank of Huntsville, N.A. v. Spragins,* 475 So.2d 512, 513–14 (Ala.1985) (trial court incorrectly allowed jury trial for plaintiffs suing for breach of trust, an accounting and money damages). An exception may exist if the trustee is under a duty to pay money immediately and unconditionally to the beneficiary. *See Dixon v. Northwestern Nat'l Bank of Minneapolis,* 297 F.Supp. 485 (D.Minn.1969) (allowing action at law).

 Claiming to fall within the *Dixon* exception, these plaintiffs now suggest that Mary Ann had in fact asserted a claim for immediate payment of money, distinct from the claim to compel Norwest to reimburse the trust in the specified amount of $95,585. However, any claim here based on lost income is merely a duplication of the assertion of the alleged undervaluation of the trust shares; moreover, plaintiffs did not list a sum certain in their complaint, but sought compensatory damages in excess of $50,000 against each defendant, as well as punitive and exemplary damages and damages for pain and suffering. We are therefore guided by the principle that a right to a jury trial is not guaranteed merely because plaintiffs only seek monetary damages. *Swanson v. Alworth,* 168 Minn. 84, 90, 209 N.W. 907, 909 (1926). The plaintiffs' attempt to recast their claims in terms of Mary Ann's entitlement to immediate payment is without persuasion and we conclude that the trial court did not abuse its discretion in denying plaintiffs a jury trial against Norwest as trustee.

 Those claims asserted against the defendants Uselman relating to intentional, reckless and negligent misrepresentation and breach of fiduciary duty survived the pretrial proceedings. Although the question of entitlement to a jury trial of those claims is more difficult, we conclude that the trial court correctly determined that plaintiffs' claims against defendants Uselman were derivative in nature. If a third person commits a tort against trust property, the trustee has a duty to take reasonable steps to compel the tortfeasor to redress the injury. G.G. Bogert & G.T. Bogert, *The Law of Trusts & Trustees* § 869 at 88 (Rev.2d ed. 1982); *Restatement (Second) Trusts* § 177 comment a. "The general rule is that the beneficiary may sue in his own name to enforce his rights under a trust where the trustee fails or neglects to do so." *Veranth v. Moravitz,* 205 Minn. 24, 29, 284 N.W. 849, 852 (1939). *See also Restatement (Second) Trusts* § 282. However, "[t]he beneficiaries of a trust cannot maintain an action at law against a third person who commits a tort or other wrong with respect to the trust property * * *." 4 A. Scott & W. Fratcher, *The Law of Trusts* § 281 (4th ed. 1989). When the

trustee fails to bring suit against a third party tortfeasor, the beneficiaries may properly bring an action against the trustees and third parties as co-defendants. *Id.* at § 282.1. Here, the plaintiffs asserted that defendants Uselmans' misrepresentations regarding the status of the corporations and the value of the shares induced Norwest to sell the shares at an artificially low price. Accordingly, the trial court did not err in characterizing the plaintiffs' claims against the Uselmans as derivative in nature and in denying their request for trial by jury.

It is necessary to point out, however, that the trial court clearly erred in stating that it is inadvisable for juries to value corporate stock. Here, the presentation of expert testimony relating to the value of the Usie real estate holdings and the valuation of the stock of both corporations was critical to all parties and the weighing of conflicting evidence in judging the credibility of witnesses is traditionally a jury function. *Lieser v. Northern States Power Co.*, 268 Minn. 95, 107, 128 N.W.2d 292, 300 (1964). Had this been an action at law, absent unusual circumstances, it would be firmly within the province of the jury as trier of fact to weigh and evaluate those expert opinions with regard to the corporate stock valuation.

2. *Exclusion of Evidence.* The question of whether to admit or exclude evidence rests within the broad discretion of the trial court and its ruling will not be disturbed unless it is based on an erroneous view of the law or constitutes an abuse of discretion. *Reinhardt v. Colton*, 337 N.W.2d 88, 93 (Minn.1983). Entitlement to a new trial on the grounds of improper evidentiary rulings rests upon the complaining party's ability to demonstrate prejudicial error. *Midway Center Assoc. v. Midway Center, Inc.*, 306 Minn. 352, 356, 237 N.W.2d 76, 78 (Minn.1975).

The plaintiffs claim first that the trial court erred by excluding testimony relating to Norwest's declination to act as executor. To the extent this assertion has no relation to the issues tried, we find no basis upon which to conclude that the trial court abused its discretion. Plaintiffs also contend, however, that the trial court erred by excluding the testimony of certain potential outside purchasers. The basis of the preliminary exclusion was the plaintiffs' failure to comply with an earlier court order directing disclosure of these potential witnesses. Upon reconsideration, the trial court authorized outside purchaser testimony only if it was newly discovered.

The trial court has the discretion to exclude testimony because of failure to timely disclose witnesses. *See Dennie v. Metropolitan Medical Center*, 387 N.W.2d 401 (Minn.1986); *Sandhoffer v. Abbott–Northwestern Hospital*, 283 N.W.2d 362 (Minn. 1979). It may exclude testimony where the delay in disclosure is inexcusable and introduction of the testimony is disadvantageous to the opposing party. *Dennie*, 387 N.W.2d at 405; *Sandhoffer*, 283 N.W.2d at 369. We conclude that, under the recorded circumstances, it was within the trial court's discretion to disallow the testimony of witnesses, known to plaintiffs 18 months earlier, whose disclosure had been required by court order.

3. *Requirement that Plaintiffs Produce Ready and Willing Buyer.* The plaintiffs also allege that the trial court erred in requiring them to produce testimony of a ready, willing and able buyer to demonstrate that the stock was sold at less than fair market value, particularly when the failure to look elsewhere is the precise nature of their complaint. Minnesota Statute Section 501B.81, subd. 7 (1989) authorizes a trustee to "sell * * * an asset, at public or private sale, for cash or on credit, with or without security as the trustee deems advisable." The insurance trust agreement gave Norwest the "full power and authority as to any properties * * * without the necessity of notice * * * or approval * * * in the trustee's continuing sole discretion * * * to sell * * * any assets of the trust estate." Although the trial court directed the plaintiffs to produce outside purchaser testimony, Norwest itself had no statutory or contractual obligation to solicit outside purchasers. We conclude that it was inappropriate to place

such an evidentiary burden on the party challenging the sale. Although the trial court's statements during trial indicating that market value was a matter of expert opinion were inconsistent, the court did not base its determination with regard to valuation solely on the existence of outside purchasers. Instead, it seems to have weighed this evidence as but one factor in the ultimate valuation decision and the plaintiffs, who introduced other evidence of fair market value, accordingly were not prejudiced by this requirement.

4. *Right to Trial Before a Fair and Impartial Judge.* Rather than timely availing themselves of the opportunity to remove the judge pursuant to the procedure authorized by Minn.R.Civ.P. 63.03, the plaintiffs, during trial, moved for the trial court's recusal or, in the alternative, the declaration of a mistrial, contending that they did not believe they were able to receive a fair trial because the court had predetermined a number of issues, would not permit designated testimony and lacked respect for counsel's abilities as an attorney. The motion was denied.

█ Generally, a party who fails to remove a judge before the start of trial has lost its opportunity to do so unless it demonstrates prejudice or implied or actual bias. Such a motion for removal is committed to the sound discretion of the trial court. "[A] judge who feels able to preside fairly over the proceedings should not be required to step down upon allegations of a party which themselves may be unfair or which simply indicate dissatisfaction with the possible outcome of the litigation." *McClelland v. McClelland*, 359 N.W.2d 7, 11 (Minn.1984).

█ At the close of trial, after the trial court reached its decision, plaintiffs moved for a new trial pursuant to Minn.R. Civ.P. 52 and 59, alleging among other irregularities, the unfamiliarity of the court with earlier proceedings and renewing their claims of the court's bias and prejudice toward plaintiffs and their counsel. The

motion was denied in all respects. The decision whether to grant a new trial on this ground rests within the sound discretion of the trial court and will be reversed only for a clear abuse of that discretion. *Wild v. Rarig,* 302 Minn. 419, 433, 234 N.W.2d 775, 785 (1975), *cert. denied,* 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976). A primary consideration is whether any claimed misconduct is so serious that it denies the litigants a fair trial. *Id.* 302 Minn. at 434, 234 N.W.2d at 786. Here, the trial court's conduct and comments do not demonstrate its understanding of our general admonition that courts be sensitive to even the appearance of impropriety so that litigants will be given no reason to believe their case will not be fairly judged. *See McClelland v. McClelland,* 359 N.W.2d at 11; *Jones v. Jones,* 242 Minn. 251, 261–62, 64 N.W.2d 508, 515 (1954) (citations omitted). However, upon review of the record in its entirety, we are not persuaded that the trial court's comments, if perhaps not always appropriate, were prejudicial, biased or deprived plaintiffs of their right to a fair trial. Neither are we persuaded that the outcome of this litigation would have been different had the court not so conducted itself. *See Gopher State Business Opportunities v. Stockman,* 265 Minn. 185, 189, 121 N.W.2d 613, 615 (1963). Accordingly, we do not find the requisite abuse of the trial court's discretion in denying the post-trial motion for a new trial so as to require our intervention.

5. *Sanctions.* As indicated, we granted accelerated review primarily to address the question of the propriety of sanctions imposed against the plaintiffs' counsel pursuant to Minnesota Statute Section 549.21 (1988) and Minn.R.Civ.P. 11 (1989). In our view, the issue is of significance to attorneys and litigants alike and provides us with an opportunity to explore the substantive and procedural intricacies of such awards.[4]

█ We first consider whether sanctions were appropriate pursuant to section

---

4. The Minnesota State Bar Association—Civil Litigation Section, the Minnesota Trial Lawyers Association, the Academy of Certified Trial Law-
yers of Minnesota and the Minnesota Civil Liberties Union served and filed briefs as amici curiae.

549.21. While under the "American Rule," "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser," *Alyeska Pipeline Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975); *Fownes v. Hubbard Broadcasting*, 310 Minn. 540, 542, 246 N.W.2d 700, 702 (1976), a well-recognized exception exists if an attorney proceeds in bad faith. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765-66, 100 S.Ct. 2455, 2463-64, 65 L.Ed.2d 488 (1980); *Fownes*, 310 Minn. at 542, 246 N.W.2d at 702 (citations omitted). The bad faith exception was codified at section 549.21 (1978). *Cherne Indus. v. Grounds & Assoc.*, 278 N.W.2d 81, 96-97 n. 13 (Minn. 1979).

■ Prior to its 1986 amendment,[5] section 549.21 (1982) provided as follows:

> Upon motion of a party, the court in its discretion may award to that party costs, disbursements, reasonable attorney fees and witness fees if the party or attorney against whom costs, disbursements, reasonable attorney and witness fees are charged acted in bad faith; asserted a claim or defense knowing it to be frivolous; asserted an unfounded position solely to delay the ordinary course of the proceedings or to harass; or committed a fraud upon the court. To qualify for an award under this section, a party shall give timely notice of intent to claim an award. An award under this section shall be without prejudice and as an alternative to any claim for sanctions that may be asserted under the rules of civil procedure. Nothing herein shall authorize the award of costs, disbursements or fees against a party or attorney advancing a claim or defense unwarranted under existing law, if it is supported by a good faith argument for an extension, modification, or reversal of the existing law.

Although defendants Uselman concede the 1986 version of the statute is inapplicable, they assert that the court has upheld sanc-

tions in similar cases under the 1982 version of section 549.21. Norwest, however, contends that O'Toole's conduct violated both or either version of the statute. However, because the plaintiffs' action was pending on August 1, 1986, the 1982 statute quite clearly controls.

■ Requisite to an award of statutory sanctions is that counsel proceeded in bad faith. *Minnesota–Iowa Television Co. v. Watonwan T.V. Improvement Ass'n*, 294 N.W.2d 297, 311 (Minn.1980). As the existence of bad faith is an issue of fact, *Anderson v. Medtronic, Inc.*, 382 N.W.2d 512, 515 (Minn.1986), the trial court is in the best position to make this determination. *Cherne Indus.*, 278 N.W.2d at 97. A subjective test is used under the 1982 statute and the burden of proving the "knowing assertion of a frivolous claim" is on the party seeking the sanctions. *Libera v. Burlington N. R.R. Co.*, 394 N.W.2d 827, 829 (Minn.App.1986).

■ While we are unable to ascertain that the trial court recognized that this matter was governed by the pre–1986 amended version of section 549.21, it is clear that in any event its award of statutory sanctions was erroneous. Not only did the defendants present no evidence that O'Toole or plaintiffs acted in bad faith, but also, the trial court failed to make the requisite statutory finding that plaintiffs proceeded in bad faith or that the claims were interposed for purposes of delay. Instead, the trial court's stated rationale for imposing sanctions was that O'Toole asserted frivolous and costly claims in the plaintiffs' second amended complaint. However, many of the claims then characterized by the trial court as "frivolous" had been dismissed as early as April 1, 1987 and others immediately prior to trial.

■ The trial court further explicated its decision:

> the failure to produce such evidence [to prove the case] is not now the basis for

**5.** Plaintiffs filed their original complaint on April 3, 1984, a first amended complaint thereafter and a second amended complaint on April 6, 1987. By its terms, the 1986 amendment was applicable to "all actions commenced on or after the effective date" of the legislation, i.e., August 1, 1986. See Act of March 25, 1986, ch. 455, §§ 83 and 95, 1986 Minn.Laws 880, 886.

imposition of sanctions, as it does appear to the Court that Plaintiffs' counsel's failure to recognize exactly what was necessary to successfully pursue such claim is not the basis on which sanctions should be imposed. Such failure is more in the nature of demonstrating a lack of a full understanding as to what may be needed, or a lack of needed pre-trial investigation or preparation, rather than pursuit of an improper claim. Such failure in an action such as is here involved does not reach the level as to the underlying allegation as being one interposed for an improper purpose.

However, in this regard, the record demonstrates significant factual and legal research undertaken by O'Toole before accepting the plaintiffs' case and in preparation for trial and her affidavit details the evidence supporting each claim contained in the second amended complaint. She affied that extensive investigation buttressed her belief that plaintiffs' claims were meritorious and that, additionally, she had continually consulted with other attorneys, two disinterested district court judges, a former bank trust officer, a former federal judge and a law school professor during the course of litigation. While under certain circumstances it may be appropriate to impose sanctions when a party proceeds to trial on the basis of personal opinion rather than a well-founded or reasonable legal position, see *Matter of Application of Mrosak*, 415 N.W.2d 98, 102 (Minn.App.1987), *pet. for rev. denied* (January 28, 1988), *cert. denied*, 487 U.S. 1237, 108 S.Ct. 2906, 101 L.Ed.2d 938 (1988), the substantial amount of effort O'Toole expended researching the facts and the law simply cannot be equated with statutory bad faith.

 Alternatively, the statute provides a separate basis for the imposition of sanctions when an unfounded position is asserted to harass; here, the court focused upon the claimed inappropriate inclusion of Mary Ann's five children as plaintiffs. However, by predicating an award in part on this basis, the trial court has exhibited its unfa-miliarity with the issues and procedural history of the case. On April 1, 1987, the first pre-trial judge denied a motion to dismiss the children as parties, stating that "the [children's] present and contingent interest in the trusts are sufficient to confer standing in a suit to redress injury to that trust." Moreover, plaintiffs introduced the insurance trust agreement into evidence, a document which fully detailed the children's trust interest. To find harassment under these circumstances is improper.

We therefore hold that, as there is no evidence in the record to support any finding or conclusion that O'Toole acted in bad faith, asserted frivolous claims or propounded an unfounded position for purposes of delay or harassment, the trial court's award of statutory sanctions constituted an abuse of its discretion.

We then consider the propriety of the sanctions imposed on the basis of Minn.R. Civ.P. 11. As with the statute, there would appear to be some confusion as to whether the former version or the current version of the rule, effective July 1, 1985, controls the instant proceedings. However, we conclude that under either of the significantly different standards, the imposition of sanctions was erroneous.

In its 1984 version, Rule 11[6] required counsel to certify by signature "to the best of his knowledge, information, and belief there is good ground to support [the pleading]; and that it is not interposed for delay." A willful violation of the rule *could* subject counsel to "appropriate disciplinary action." As with Minn.Stat. § 549.21 (1982), a finding of subjective bad faith was a prerequisite to the imposition of sanctions and, accordingly, our statutory analysis *supra* applies with equal force to an examination of the second amended complaint under former Rule 11. As the record contains no evidence of O'Toole's bad faith and as the trial court made no finding to that effect and instead concluded that plaintiffs' claims only were, in its

---

**6.** The former version of Fed.R.Civ.P. 11 was virtually identical to the former Minn.R. Civ.P. 11.

view, "unfounded," its award of sanctions constituted an abuse of discretion.

On this our first occasion to address the nature and scope of the new Rule, we note that there are only minor and insignificant differences between Minn.R.Civ.P. 11 (1989) and Fed.R.Civ.P. 11, as amended in 1983, and that, accordingly, while not binding on this court,[7] cases interpreting the federal rule are valuable guidelines in understanding its purpose and application. Acknowledging that former Rule 11 had not been effective in deterring abuses in the signing of pleadings, the federal rules adopt new language to "discourage dilatory or abusive tactics and help to streamline the litigation process by lessening frivolous claims and defenses." Fed.R. Civ.P. 11 advisory committee's note to the 1983 amendment; *Golden Eagle Distrib. Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1536 (9th Cir.1986). Confusion over the primary purpose of the rule—deterrence— has been a predominant reason for the inconsistency and apparent arbitrariness of Rule 11 decisions in the federal courts. *See generally*, Untereiner, *A Uniform Approach to Rule Sanctions*, 97 Yale L.J. 901, 902, 905–09 (1988). In fact commentators have cautioned courts against viewing the primary purpose of the new rule as penalizing violators or compensating fee-seeking parties. *See, e.g., Id.* at 907–08; Vairo, *Rule 11: A Critical Analysis*, 118 F.R.D. 189, 203–4 (1988). We, however, are clear in our view of the rule as a mechanism for deterrence rather than a punitive or cost-shifting device. *See Cooter & Gell v. Hartmarx Corp.*, —— U.S. ——, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990); *but see* Minn.R.Civ.P. 11 (1989) advisory committee's note (imposition of costs is "compensatory in nature"). Correspondingly, we believe, as a matter of public policy, that the rule should be construed somewhat narrowly—while some sanctionable conduct might under these circumstances escape discipline, that is preferable to deterring legitimate or arguably legitimate claims.

The current version of Rule 11 significantly altered counsel's certification responsibility, eliminating the bad faith threshold and substituting in its stead, a certification that, upon belief after reasonable inquiry, a pleading or other paper is well-grounded factually, warranted by existing law or is a good faith argument for changing existing law and filed for proper purposes only.[8] In other words, an affirmative duty is imposed on counsel to investigate the factual and legal underpinnings of a pleading. Moreover, the imposition of sanctions is mandatory if the rule is violated.

Eliminating the subjective standard of its former version, new Rule 11

---

**7.** *See, e.g., Leer v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.,* 308 N.W.2d 305, 308 (Minn. 1981).

**8.** In its entirety, Minn.R.Civ.P. 11 (1989) provides:

Every pleading, motion and other paper of a party represented by an attorney shall be personally signed by at least one attorney of record in the attorney's individual name and shall state the attorney's address. A party who is not represented by an attorney shall personally sign the pleading, motion or other paper and state the pleader's address. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit. The signature of an attorney or party constitutes a certification that the pleading, motion or other paper has been read; that to the best of the signer's knowledge, information and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation. If a pleading, motion or other paper is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the pleader or movant. If a pleading, motion or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion or other paper, including reasonable attorney fees.

embodies an objective standard.[9] The standard now is one of reasonableness under the circumstances. *Threaf Properties v. Title Ins. Co. of Minnesota,* 875 F.2d 831, 835 (11th Cir.1989); *Davis v. Crush,* 862 F.2d 84, 89 (6th Cir.1988). A Rule 11 sanction should not be imposed when counsel has an objectively reasonable basis for pursuing a factual or legal claim or when a competent attorney could form a reasonable belief a pleading is well-grounded in fact and law. *Kale v. Combined Ins. Co. of America,* 861 F.2d 746, 759 (1st Cir. 1988) (affirming court's refusal to impose sanctions); *Adamson v. Bowen,* 855 F.2d 668, 673 (10th Cir.1988) (quoting *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 254 (2nd Cir.1985), *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987)). The court's inquiry may therefore be directed to the reasonableness of the pre-filing investigation. *Calloway v. Marvel Entertainment Group,* 854 F.2d 1452, 1470 (2nd Cir.1988), *rev'd in part sub nom. Pavelic & LeFlore v. Marvel Entertainment Group,* —— U.S. ——, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989). In this regard the following factors may properly be considered:

> how much time for investigation was available to the signer; whether he had to rely on a client for information as to the facts underlying the pleading, motion, or other paper; whether the pleading, motion, or other paper was based on a plausible view of the law; or whether he depended on forwarding counsel or another member of the bar.

Fed.R.Civ.P. 11 Advisory committee's note to the 1983 amendment.

 Upon application of these principles and guidelines, we are not persuaded that O'Toole's pre-filing investigation of the facts and the law warrants the imposition of sanctions. Certainly, she had to place greater reliance on plaintiffs in filing the first complaint than in filing the first and second amended complaints. However, based upon the extensive discovery conducted by all parties, plaintiffs' testimony and documentary evidence relating to the corporations and Norwest's sale of the stocks, a competent attorney could have reasonably believed that there existed well-founded factual bases upon which to proceed to trial. That the trial court, as here, disagreed with the legal theories upon which plaintiffs proceeded is an insufficient basis upon which to impose sanctions. Similarly, where the court is critical of counsel's conduct at trial, other means are available to it to discipline counsel. *See In Re Yagman,* 796 F.2d 1165, 1187 (9th Cir. 1986), *modified,* 803 F.2d 1085 (9th Cir.), *cert. denied sub nom. Real v. Yagman,* 484 U.S. 963, 108 S.Ct. 450, 98 L.Ed.2d 390 (1987).

 To facilitate an orderly and uniform approach to the imposition of sanctions, we are of the view that certain minimum procedural guidelines must be established. First, the attorney or party must have fair notice of both the possibility of a sanction and the reason for its proposed imposition. *Donaldson v. Clark,* 819 F.2d 1551, 1559–60 (11th Cir.1987). Since one of the primary purposes of Rule 11 is to deter litigation abuse, this notice should be given as early as possible during the proceedings to provide the attorney and party the opportunity to correct future conduct. A policy of deterrence "is not well served by tolerating abuses during the course of an action and then punishing the offender after the trial is at an end. A proper sanction assessed at the time of the transgression will ordinarily have some measure of deterrent effect on subsequent abuses and resultant sanctions." *Yagman,* 796 F.2d at 1183. Only in very unusual circumstances will it be permissible for the trial court to wait until the conclusion of the litigation to announce that sanctions will be considered or imposed. Similarly, a party intending to seek sanctions should notify the court and other parties with specificity of that intention.

---

9. *Brown v. Fed'n of State Medical Bds. of the U.S.,* 830 F.2d 1429, 1435 (7th Cir.1987); *Eastway Const. Corp. v. City of New York,* 762 F.2d 243, 253 (2nd Cir.1985) *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).

■ Secondly, the attorney or party should be given an opportunity to respond to the notice of a possible Rule 11 sanction. *Gagliardi v. McWilliams*, 834 F.2d 81, 83 (3rd Cir.1987). While the type of response must depend upon the circumstances of the case and the nature and severity of the proposed sanction, *INVST Financial Group v. Chem–Nuclear Systems*, 815 F.2d 391, 405 (6th Cir.1987), *cert. denied*, 484 U.S. 927, 108 S.Ct. 291, 98 L.Ed.2d 251 (1987), the attorney must be given "an opportunity for a hearing on the record." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767, 100 S.Ct. 2455, 2464, 65 L.Ed.2d 488 (1980) (construing the imposition of sanctions under 28 U.S.C. § 1927). It may not always be necessary for the trial court to hold a *separate* hearing to consider Rule 11 motions. *Davis v. Crush*, 862 F.2d at 88; *INVST*, 815 F.2d at 405. However, if a case is dismissed without trial, some type of hearing may be compelled. *Davis*, 862 F.2d at 89.

■ In the matter before us, defendant Norwest apparently served a notice of intent to claim fees and costs pursuant to Minn.Stat. § 549.21 on July 16, 1986 and defendants Uselman filed a notice of intent to claim attorney fees pursuant to that same statute on July 18, 1986. At no time during the proceedings did the trial court indicate that it was considering imposing sanctions. On February 26, 1988, defendants Uselman filed a motion for attorney fees and other sanctions pursuant to section 549.21 and Rule 11 and Norwest, apparently in response to an invitation from the court, filed its broader motion for more comprehensive fees and costs on June 3, 1988 only after the trial court filed its order for judgment. The trial court concluded what it characterized as a "pre-motion" conference on June 10, 1988, at that time identifying what it considered deficiencies in the pleadings. While it denied O'Toole's request for an evidentiary hearing, it permitted the filing of responsive memoranda and scheduled a second hearing at which the pre-trial judge would be present.

At the second hearing, the court criticized O'Toole's request for separate counsel to represent plaintiffs' interests and denied her request for a continuance until the transcript was completed. While the court permitted separate representation, it opined that no transcript was necessary and intimated that the hearing itself might not be required. It again permitted responsive and reply memoranda.

The deficiencies in those proceedings may be readily identified. First, O'Toole was not timely notified of the potential for sanctions. To the extent indistinct references were made by defendants in briefs and memoranda, the notice was inadequate. Second, upon request, counsel should have been given the opportunity to obtain and review the trial transcript. Third, the trial court was incorrect in criticizing O'Toole's prudent advice to her clients that they should retain separate counsel for these purposes. Finally, it was incumbent upon the first pre-trial judge to award sanctions at the time of the claimed abuse, and certainly, to rule itself on any claimed violations which occurred while that court presided. We observe that defendants collectively brought five motions for summary judgment or dismissal before trial and that, while the court narrowed the issues, it did allow the plaintiffs to proceed to trial. A party who survives these motions with the major claims intact should not be subject to sanctions after trial predicated on these surviving claims. *Greenberg v. Hilton Int'l Co.*, 870 F.2d 926, 937 (2d Cir.1989), *vacated and remanded on other grounds*, 875 F.2d 39 (2d Cir.1989). As one commentator has noted:

> The interest in the early disposition of meritless cases is not served * * * when post-trial motions for Rule 11 sanctions, based on the filing of a frivolous complaint, are granted when the moving party previously lost a summary judgment motion. Such rulings only encourage a "never say die" attitude toward sanctions motions and increase the burden of satellite litigation. * * * A party who has survived a summary judgment motion or a motion to dismiss certainly has no reason to believe that the court con-

siders its claim or defense frivolous; indeed, the opposite is the case.

Nelken, *Has the Chancellor Shot Himself in the Foot? Looking for a Middle Ground on Rule 11 Sanctions*, 41 Hastings L.J. 383, 390–91 (1990). *See also* Schwarzer, *Rule 11 Revisited*, 101 Harv.L. Rev. 1013, 1019 (1988) (criticizing awards of sanctions for frivolousness after court denies summary judgment motions).

■ Were we not convinced as a matter of law that sanctions were erroneously imposed, we would have remanded the matter to the trial court for the comprehensive further proceedings we outline today. Trial courts are instructed to afford these minimum procedural safeguards and to tailor any sanctions to the unique facts of an individual case to accomplish the fundamental purpose of the rule—deterrence. To that end, the American Bar Association has formulated a variety of sanctions available to a court:

a. a reprimand of the offender;

b. mandatory continuing legal education;

c. a fine;

d. an award of reasonable expenses, including reasonable attorneys' fees, incurred as a result of the misconduct;

e. reference of the matter to the appropriate attorney disciplinary or grievance authority;

f. an order precluding the introduction of certain evidence;

g. an order precluding the litigation of certain issues;

h. an order precluding the litigation of certain claims or defenses;

i. dismissal of the action;

j. entry of a default judgment;

k. injunctive relief limiting a party's future access to the courts; and

l. censure, suspension or disbarment from practicing before the forum court, subject to applicable rules or statutes.

*Standards & Guidelines for Practice Under Rule 11 of the Federal Rules of Civil Procedure*, 121 F.R.D. 101, 124 (1988). The court should impose the least severe sanction necessary to effectuate the purpose of deterrence, *Jackson v. Law Firm of O'Hara, Ruberg, Osborne and Taylor*, 875 F.2d 1224, 1229 (6th Cir.1989); *Thomas v. Capital Sec. Services*, 836 F.2d 866, 878 (5th Cir.1988); *Brown v. Fed'n of State Medical Bds. of the U.S.*, 830 F.2d 1429, 1437 (7th Cir.1987), and may also consider the presence or absence of bad faith in determining an appropriate sanction. *Business Guides v. Chromatic Communications Enterprises*, 892 F.2d 802, 810 (9th Cir.1989).

■ If the court chooses to impose a monetary sanction, it might consider the attorney's or party's ability to pay. *Johnson v. New York City Transit Authority*, 823 F.2d 31, 32–33 (2d Cir.1987). Similarly, it must consider any relevant mitigating factors. *Doering v. Union County Bd. of Chosen Freeholders*, 857 F.2d 191, 195–96 (3rd Cir.1988). Under any circumstances, the aggregate award of $190,200 against O'Toole would have been viewed as excessive and without regard for the ability of this sole practitioner to pay such a sanction.

Finally, our decision today provides us with an opportunity to announce the appropriate standard of appellate review.

■ We are persuaded that the recent pronouncement by the United States Supreme Court in *Cooter & Gell v. Hartmarx Corp.*, —— U.S. ——, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) most clearly identifies an appellate court's inquiry, concluding that an application of an abuse of discretion standard in reviewing all aspects of a Rule 11 determination must properly afford the trial court the flexibility necessary to resolve the initial questions and most readily accomplishes the policy goals of the rule. In application of that standard, the trial court here clearly abused its discretion.

Defendants have requested attorney fees on appeal. The request is denied as beyond the scope or intent of Rule 11. *See Cooter & Gell v. Hartmarx Corp.*, —— U.S. ——, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).

Affirmed in part; reversed in part.

SIMONETT, J., concurs specially.

TOMLJANOVICH, J., not participating.

SIMONETT, Justice (concurring specially).

After 4 years of pretrial discovery and maneuvering, the trial eventually narrowed down to a claim for, at most, $96,000 (the amount by which plaintiffs claimed the stock sale price was inadequate). After 9 days of trial, the court found in favor of the defendants. In "winning" the lawsuit, defendants expended $352,097.26 in attorney fees and costs. For defendant George Uselman, a 71–year–old retiree, the litigation was especially disastrous, seriously depleting his retirement assets.

Among the factors prominent in prolonging this litigation were, first, this was a family fight with the usual doggedness and paranoia, and, second, plaintiffs wanted substantial punitive damages.[1] My concern with the case is not so much with the adequacy of the prefiling investigation but with what happened thereafter. Once the suit was filed it took on a life of its own, producing over 400 exhibits, some 18 depositions, and shifting theories of recovery under a complaint amended twice. Plaintiffs' counsel persisted in pursuing numerous peripheral claims after they were revealed to be of no merit, and discovery was carried to the point of diminishing returns. This is particularly true with respect to claims against George and Jerry Uselman.

If plaintiffs' counsel had received timely and fair warning of the possible imposition of sanctions, I might have been inclined to defer to the trial judge's discretion in imposing monetary sanctions here, but in a much lesser amount than was done. But because such warning was not given, I agree with the majority's outright reversal of any monetary sanction.

The larger question presented by this case is how our litigation system can resolve disputes on a rational cost-benefit basis. Put another way, can civil litigation survive without some kind of sensible cost containment? In my view, Rule 11 is not much help. While the rule is intended to deter litigation abuse, it often itself contributes to that abuse and serves to chill aggressive, imaginative advocacy. *See, e.g.,* M.L. Nellan, *The Impact of Federal Rule 11 on Lawyers and Judges in the Northern District of California,* 74 Judicature 147 (1990).

If there is to be effective litigation cost containment, we will have to look elsewhere. To a large extent, it seems to me, the adversarial system must look to the self-restraint of counsel. This seems appropriate. Then, if the litigation model of dispute resolution becomes outmoded because of its costliness, the bar will have no one to blame but itself.

One gets the impression in this case that if plaintiffs' attorney had associated with experienced trial counsel, some needed focus and realism might have been injected into this litigation and it would not be here now.

---

1. The trial court had denied defendants' pretrial motions to eliminate the punitive damages claim on a wait-and-see basis; when the waiting was over, no evidence justifying punitive damages had been produced.