**NEW MARKET TOWNSHIP,**
Appellant,

v.

**CITY OF NEW MARKET, Respondent.**

No. C9–02–37.

Court of Appeals of Minnesota.

Aug. 6, 2002.

Robert A. Nicklaus, Eric J. Braaten, Nicklaus, Braaten & Hollenhorst. PLLC, Chaska, MN, for appellant.

Thomas M. Scott, Campbell Knutson, Eagan, MN, for respondent.

Considered and decided by RANDALL, Presiding Judge, STONEBURNER, Judge, and FOLEY, Judge.*

## OPINION

R. A. RANDALL, Judge.

New Market Township, brought an accounting action in the district court (1) seeking to recover a $240,000 contribution to the City of New Market for construction of a fire hall and (2) alleging an overpayment under the township/city fire service contracts. The district court, following a bench trial, found in favor of the city and, in January 2001, denied the township's motion for judgment notwithstanding the verdict. The township appeals alleging that (a) the township was not authorized to contract with the city to build and fund a fire hall; (b) the city breached the agree-

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

ment by profiting from the surplus created by excess levies and by unauthorized spending of capital-fund contributions; (c) the city owes damages for breach of contract, unjust enrichment, or restitution; and (d) the court erred in allowing an agreement as evidence of an enforceable contract. We affirm.

## FACTS

Appellant township and respondent city have entered into an annual fire service contract since the 1980's whereby the city volunteer firemen provided fire and emergency services for New Market Township (township), City of Elko, Cedar Lake Township, and the City of New Market (city). The township is ten times more populated than the city and accounts for approximately 75% of the fire and emergency calls.

In 1991 and the following years, city firemen discussed building a new fire hall (in the City of New Market) at the annual township meeting. At the 1994 annual meeting the township electors were updated on the fire hall's progress and informed that the cost projection to build the fire hall was between $300,000 and $600,000. The electorate passed two motions at the meeting authorizing a joint-powers agreement and authorizing bonding by the township for $250,000 toward the construction costs of the city's fire hall. The township in 1995 entered into a building agreement with the city whereby the township agreed to pay the $250,000 toward construction costs. Included in the building agreement were provisions for 20 years of fire service for the township and, if the city terminated services, the city would repay the township on a pro rata basis. The building agreement was also approved at a council meeting by the City of New Market.

The annual fire-service contracts provided that the township would contribute funds for fire services and toward building a fire hall. The 1995 fire-service contract contained a provision to contribute $250,000 to the construction of the New Market Area Hall and referenced the building agreement.

At the 1996 annual meeting, the township electors voted to approve the 1996 fire-service contract. In 1996, the township paid $240,000 toward constructing the fire hall, which was completed in 1996. The area hall building housed the fire department, a common area, and a city hall. In 1997, rent payments were approved to cover the cost of utilities. The road and bridge fund and excess money from the fire-service contracts paid for the fire hall and eliminated the need for the township to borrow funds.

In 1998, after a petition filed by the township electors at the annual meeting, the state auditor audited the township's and city's records. The auditor concluded that although the electors' actions at the 1994 annual town meeting could be construed as an agreement to commit $250,000 for constructing the building, the electors did not specifically approve a debt or levy for that amount. The report further determined that road and bridge funds were used to build the fire hall. The auditor's report discussed the township's possible recoupment of road and bridge funds and seeking an ownership interest in the building. The report stated:

> [W]e recommend that the Town consider seeking legal counsel concerning possible avenues of recovering Road and Bridge funds paid over to the City Fire Hall, and that it seek an ownership interest and/or a renegotiation of its lease with the City.

## ISSUE

I. Did the township electors authorize the town board to enter into an

agreement to construct and fund a fire hall?

II. Did the township electors authorize a levy of $240,000 toward construction costs to build the city's fire hall?

III. Was a surplus created that breached the fire-service contracts and unjustly enriched the city?

IV. Did the city breach its fire-service contracts with the township by unauthorized spending of designated capital fund contributions?

V. Did the district court err in allowing the March 7, 1995, building agreement into evidence?

## ANALYSIS

An appellate court will not set aside a trial court's findings of fact unless they are clearly erroneous. Minn. R. Civ. P. 52.01; *Fletcher v. St. Paul Pioneer Press,* 589 N.W.2d 96, 102 (Minn.1999). A reviewing court, when applying Minn. R. Civ. P. 52.01, views the record in a light favorable to the district court. *Rogers v. Moore,* 603 N.W.2d 650, 656 (Minn.1999). If the trial court's findings are reasonably supported by the evidence, they are not clearly erroneous and must be affirmed. *Citizens State Bank v. Leth,* 450 N.W.2d 923, 925 (Minn.App.1990).

### I. Fire hall

The key issue in this case is whether the township and the electorate had the necessary information needed to make an informed decision to authorize the expenditures of funds to contribute toward the fire hall. Minn.Stat. § 365.10, subd. 6 (2000), governs constructing town buildings and provides:

The electors may let the town board buy or build a town hall or other building for the use of the town. The electors must decide the amount of money to be raised for that purpose.

The township first argues that the electorate did not authorize the town board to build a "combined city and fire hall or issue General Obligation or revenue Bonds" to construct the fire hall. The city argues that the electors at the 1994, 1995, and 1996 annual meetings both approved and authorized the township to contribute toward building the fire hall.

The record supports the district's court's findings that the township board was authorized to enter into a contract with the city to build a fire hall. The district court found:

[a]t the March 8, 1994 annual meeting the township's electorate "unanimously approved two related motions authorizing the Township to participate with the City on the fire hall and authorized the Township to borrow up to the necessary amount to provide funds for the fire department to begin construction.

The minutes from the March 8, 1994, township meeting state that Fire Chief Gary Erickson discussed the "progress of the New Fire Hall" and estimated that the costs would be between $300,000 and $600,000 and that the township would have to contribute approximately $250,000 toward the cost of construction. According to the minutes of the 1996 annual meeting, Chief Erickson and John Fuller represented the fire department and told the electorate that "the name of the new fire hall shall be New Market Area Hall." The minutes also show a discussion that "City money, Fire Fund money, and Pull Tab money" would be used to finance construction before the township would be asked to contribute any of the $250,000. The minutes show that the electors discussed "the Capital Fund of New Construction" with the Fire Department members. A motion was made to accept the Capitol Fund of New Construction and the motion carried. The record further shows that the township's actual contribution of $240,000 was

in line with Chief Erickson's original $250,000 estimate and less than the cost to the township of providing its own fire protection.

The township's 20–year renewable fire-service contract with the city supports the district court's findings that the township authorized building and financing the fire hall. The 1995 and 1996 fire-service contracts contained a provision whereby the township agreed "[t]o pay the City $250,000 to help finance the construction of a fire station." The agreements further provided for a pro rated refund "[i]f the City refuses to enter into contracts in future" years to provide fire-protection services. The township minutes and the fire-service contracts support the district court's conclusion that the township's electorate was informed when it authorized the township to enter into an agreement with the city to build and fund a fire hall.

## II. Tax levies

■ The township next argues that the electors did not authorize a levy of $240,000 to build the fire hall. We disagree.

The district court found:

In its annual meetings, the Township electors authorized annual levies for fire services in amounts that exceeded the annual fire contract expenditures by a substantial amount. The excess levies for the fire fund eliminated the necessity of the Township to borrow to pay the amount owed to the City in 1996 and 1997.

Beginning July 1996, the city received five payments, totaling $240,000 from the township towards the building as follows: a payment of $102,750 on July 8, 1996; a payment of $36,100 on August 21, 1996; a payment of $26,750 on October 7, 1996; a payment of $61,000 on November 19, 1996; a payment of $13,400 on January 17, 1997. The $240,000 that the township paid came from the road and bridge component of the general fund and from amounts that exceeded the annual fire-service contract expenditures. As a result, the township did not borrow any funds to construct the fire hall. We conclude again that the district court's findings that the electorate authorized constructing and paying for the fire hall are not clearly erroneous and are supported by the record.

## III. Surplus

■ The township claims, pursuant to the state auditor's report, that a "surplus" was created that violated the fire-service contracts and unjustly enriched the city. The city argues that there was no profit and that the auditor's report determination of a surplus was due to the auditor's recategorizing many of the expenditures. The district court found that

the Township did not make any overpayments for fire and emergency for the years 1992 through 1996. The Township paid the amount it agreed to pay each year under its contracts with the City.

Appellant's contention that there was a profit resulting from excess monies paid to the city under the fire-service contracts is without merit. The township relies heavily on the state auditor's report that states there was a "surplus or profit" in the amount of $105,030. First, when the audit was performed, the auditor did not have all of the city records, used only the information from the city's reporting form that is provided to the state, and did not have the minutes of the township's 1994 annual meeting.

Second, the record shows that the cost of replacing and maintaining fire equipment was built into the fire-service contracts, which resulted in peaks and valleys in income and disbursements. When replacement and maintenance costs were low there was extra money in the account. In other years, expenditures were greater

than revenues, resulting in using the extra funds from previous years.[1] This record shows no unjust enrichment to the city and does not support the township's claim to restitution.

## IV. Unauthorized spending

█ The township argues that the city improperly used the capital fund to buy or replace equipment, which violated the fire-services contract that required the city to gain approval from the township for every expenditure it made. The district court found that there is no evidence to suggest that the expenditures for the fire hall and equipment were unauthorized. We agree.

The township's contention that the city was not authorized to buy, replace, or maintain equipment without the township's approval of each expenditure is without merit. In January 1997, the city established a capital-improvement account for fire-related expenses, which it administers. The 1996 fire-service contract between the city and township provided that "[t]he capital fund is to be used for additional or replacement equipment or * * * or [to] repair or modifications for buildings." The 1997 contract provided that money shall be paid into a capital-improvement account "for the payment of all items related to fire protection including the repair, replacement and maintenance" of the fire hall and fire equipment. The township approved each fire-service contract at the annual meeting. The fire-service contracts for the years 1995, 1996, and 1997 required the township to pay $70,760.40 for capital improvements. The township failed to make the 1995 payment and contributed only $40,155.20, which the city deposited in the capital-improvement account. The record shows that between 1996 and 1998, the township contributed a total of $61,388.20, which was deposited in the capital-improvement account for the fire department and was used for fire-related expenses, such as the purchase of a fire truck and a fire cascade system. It would be bizarre to require the city, the entity providing the fire-protection service, for a negotiated fixed cost, to have to go back to the entity receiving protection and have each and every individual expenditure approved. We will not read that into the contract. We conclude that the district court's finding that the expenditures were authorized was proper.

This case is not one where the township wanted to rescind a contract that it had just signed, where no money had been paid to construct the fire hall, and the fire hall had not been started. Rather, this was a completed transaction where both parties were content with the agreement (for years) until a state auditor's report criticized the township for its accounting practices. The state auditor's conclusion as to surplus, capital expenditures, and depreciation does not necessarily mean the same thing to two municipalities that are negotiating at arm's length, as it does to an auditor. We note that the makeup of the town board changed almost completely after the contracts were signed and after the city and the township had been operating under them for a number of years. An audit was requested, not by the old township board, but instead by the new board, which was motivated to start this litigation by the state auditor's report. The audit was done with incomplete records and four years after the first contract at issue was negotiated and three years after the building was completed and paid for.[2] Pending this litigation, the city continues to provide

---

1. For example, in 1993, the city received $27,750 from the township, but spent $61,939; in 1994, the city received $65, 658 and spent $152,005 and in 1995, the revenues were $72,295 and actual expenditures were $78,558.

2. The state auditor's report, which audited the township's financial statements for the

fire-protection services to the township under negotiated contracts.

## V. Evidentiary issue

■ The township contends that the district court erred when it received and considered the March 7, 1995, building agreement. The township objected to admitting the building agreement when David Frame was testifying in his capacity as chairman of the board at February and March 1995 board meetings about whether the other two members agreed with the terms of the contract. The court had allowed Frame's testimony, as non-hearsay, because he was acting in his capacity as chair of the governmental board that discussed the building agreement. The district court overruled the defense's objection and allowed the agreement and allowed the accompanying testimony and documents into evidence stating, "For the same reasons given earlier, I'm going to receive Exhibit 1 and overrule the objection." The court had overruled a previous objection made by the township to admitting Frame's testimony regarding whether the town board agreed with building contract terms on the same grounds and stated,

> [I]t seems to me that those who are in a position to know that accounted on behalf of the Town Board and executing documents and so on should be able to testify on the basis that they did these things.

■ The district court's evidentiary rulings were well within its discretion. Evidentiary rulings will not be reversed unless an abuse of discretion or based on an erroneous view of the law. *Uselman v. Uselman,* 464 N.W.2d 130, 138 (Minn. 1990). "A party is not entitled to reversal

of a judgment based on an erroneous evidentiary ruling unless the party demonstrates that the error was prejudicial." *Cloverdale Foods of Minn., Inc. v. Pioneer Snacks,* 580 N.W.2d 46, 51 (Minn.App. 1998) (citation omitted).

In this case, Frame signed the agreements in his capacity as chairman of the board and was present when the board discussed the building agreements. The evidence was relevant to the parties' understanding of the agreement as shown by their subsequent conduct.

## DECISION

Fire-service contracts referencing constructing and financing a fire hall and minutes of town meetings discussing and voting to build and fund a fire hall were sufficient evidence to support the district court's findings that the township electorate authorized the contribution toward the city's fire hall for purposes of the city continuing to provide fire protection to the township.

Fire-service contracts providing for funds to be deposited into a capital account and to be used for fire-related expenditures were sufficient evidence for the district court to conclude that the city was authorized to spend money from the account.

The district court properly allowed a building agreement into evidence that was relevant to the parties' understanding. The person who signed the agreement could testify.

**Affirmed.**

■

years 1992 through 1996, was signed on February 23, 1998.